**FRATERNAL ORDER OF POLICE et al., Appellees,**

v.

**CITY OF CLEVELAND et al., Appellants.**

[Cite as *Fraternal Order of Police v. Cleveland* (2001), 141 Ohio App.3d 63.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 77934, 77939 and 77948.

Decided Jan. 29, 2001.

*Falkner, Muskovitz & Phillips LLP, Robert M. Phillips* and *William M. Menzalora,* for appellees.

*Duvin, Cahn & Hutton, Robert M. Wolff, Kathleen M. Kordeleski* and *Robert P. Duvin,* for appellants.

*Cornell P. Carter,* Law Director, *Pinkey S. Carr* and *Eric J. Schaltenbrand,* Assistant Directors of Law, for city of Cleveland.

*Calfee, Halter & Griswold, LLP, Mark I. Wallach* and *Colleen Moran O'Neil,* for John Does.

*Sammon & Bolmeyer Co., L.P.A.,* and *James P. Sammon,* for Joseph Musarra.

---

PATRICIA ANN BLACKMON, Judge.

In this consolidated appeal, appellants city of Cleveland, Cleveland Civil Service Commission, Cleveland Department of Public Safety, Henry Guzman (Appeal No. 77934), Joseph Musarra (Appeal No. 77948), and fifteen "John Doe" defendants (Appeal No. 77939) appeal the trial court's decision granting an injunction prohibiting the city of Cleveland from appointing the "John Doe" defendants to the 120th class of the Cleveland Police Academy.

In Appeal Nos. 77934 and 77939, city of Cleveland, Cleveland Civil Service Commission, Cleveland Department of Public Safety, Henry Guzman, and the fifteen "John Doe" defendants assign four errors for our review:

"I. Appellants believe that the trial court erred in granting an injunction because none of the purported appellees has standing to bring this claim.

"II. Appellants believe that the trial court erred by ignoring clear Ohio Supreme Court precedent in holding that no vacancies existed for the 120th police academy class even though the funds had been budgeted and appropriated for this class.

"III. Appellants believe that the trial court erred in finding that the city violated the civil service rules. Clear evidence demonstrated that the city was not making appointments from an expired eligibility list, that individuals were not considered more than four (4) times, and that the city had good cause to extend the thirty (30) day time frame within which to make appointments following certification.

"IV. Appellants believe that the trial court erred in granting a permanent injunction because no purported appellee could show any harm or injury, let alone irreparable injury."

In Appeal No. 77948, Joseph Musarra assigns one error for our review.

"The trial court erred in dismissing plaintiff–appellant's taxpayer claim on jurisdictional grounds as the law does not require a written demand to be made where such a demand would be 'futile and unavailing.' "

After reviewing the record and the arguments of the parties, we reverse the judgment of the trial court. The apposite facts follow.

This case involves the process used to select candidates for the 119th and 120th Cleveland Police Academies. Under the Cleveland Civil Service Rules, those interested in a position as a patrolman with the city of Cleveland were given a civil service examination. Those who passed the examination were placed on an "eligible" list and ranked according to their examination score.

Civ.Serv.Comm.R. ("CSCR") 5.10 provides:

"From the returns of each competitive examination, the Commission shall prepare and keep open to public inspection, an eligible list of the persons whose grades in the examination are not less than 70% and who are otherwise eligible. Such persons shall be notified and take rank upon the eligible list or lists in the [order] of their relative grades."

Pursuant to CSCR 5.20, *eligible lists created by the Commission shall remain in force not longer than two (2) years.* (Emphasis added.)

After being placed on the "eligible" list, a candidate could be appointed to the police academy only after being "certified" for appointment.

CSCR 6.10 provides:

"Before any position in the classified service shall be filled the appointing authority shall make a written request of the Commission for the certification of the names of eligibles for such position and shall state whether the employment is to be permanent or temporary * * *. *Upon receipt of such request, the Commission shall certify to the appointing authority the names and addresses of the three persons standing highest on the eligible list* except that, if there is more than one position to be filled, the number of names to be certified shall be determined by taking the next higher multiple of four above the number of vacancies, dividing it by two and adding the quotient to the number of vacancies except where the number of vacancies is divided by two and the quotient added to the number of vacancies. * * * However, *when there is no eligible list for the exact position to be filled the Commission may certify eligibles from the eligible list most nearly appropriate to the position to be filled.*" (Emphasis added.)

According to the Glossary to the Civil Service Commission Rules, "certification means that the Civil Service Commission sends to the appointing authority a list of eligibles in the class and grade to which he/she wishes to fill *either new or vacant positions* * * *." (Emphasis added.)

An eligible person may waive certification by requesting in writing that the commission by-pass him or her for the indicated time period for the position to which the eligible person was certified. See Glossary to CSCR.

CSCR 6.20 provides:

"No person shall be considered from an eligible list more than four (4) times by an appointing authority for a classification, except at the request of the appointing authority, provided, however, that no such person shall be certified when to do so operates to prejudice the rights of other eligibles ranking higher on the eligible list. * * * *No request for certification of eligibles* or additional names to supplement existing certifications shall be honored by the Commission after the expiration of such eligible list." (Emphasis added.)

CSCR 6.60 provides:

"All regular appointments shall be accomplished within thirty (30) calendar days following the date on which certification is executed by the Commission; such period may be extended by the Commission for good cause shown."

On August 17, 1996, a written exam was conducted for the position of patrol officer in the city of Cleveland. A list of 1,547 eligible candidates was prepared from that examination on September 30, 1996. Four police academy cadet classes (115th, 116th, 117th, and 118th) were staffed with people certified from that eligible list.

On September 29, 1998, one day before the 1996 eligible list was to expire, the city requested certification of 157 names from the list. The 119th academy class

began on August 30, 1999. The city staffed the class with 74 certified candidates from the 1996 list.

Another written exam for the position of patrol officer was conducted on October 18, 1998. On October 18, 1999, the city established a new eligibility list of more than 1,800 candidates from the 1998 written examination. On November 19, 1999, the Department of Public Safety sent a memo to Cleveland Police Chief Martin Flask containing the names of 43 certified candidates from the 1996 eligible list "for consideration for the 120th Police Academy class ."

The 120th police academy was scheduled to begin on April 3, 2000. On March 13, 2000, the Fraternal Order of Police, a taxpayer (Joseph Musarra), and two candidates from the 1998 eligibility list (Stephen Zarcharias and Frank Musarra)[1] filed the instant action against the city of Cleveland, the Cleveland Civil Service Commission, the Cleveland Department of Public Safety and its director, Henry Guzman, and 43 "John Doe" defendants (certified candidates from the 1996 eligibility list) seeking to enjoin the city from appointing the candidates from the 1996 eligibility list to the 120th police academy. In their verified complaint, the plaintiffs argued that the 1996 eligibility list had expired on or about September 30, 1998. While acknowledging that the candidates were certified before the expiration of the 1996 eligibility list, the plaintiffs argued that the September 29, 1998 certifications were for the 119th academy class. They maintained that, once the 119th class was filled, the remaining certified candidates reverted to "eligible" status because there were no longer any vacancies for the entry-level patrol officer position. The plaintiffs sought a temporary restraining order and a permanent injunction prohibiting the city from including anyone from the 1996 eligibility list in the 120th police academy class.

The trial court granted the motion for a temporary restraining order and scheduled a preliminary injunction hearing. On the date of the hearing, the parties conducted extensive settlement negotiations. The trial court rescheduled the preliminary injunction hearing and ordered the trial to be consolidated with the preliminary injunction hearing.

At trial, the plaintiffs presented testimony from Gregory Wilson, Secretary of the Civil Service Commission, and Fred Szabo, Acting Director of Public Safety. Wilson testified that 74 of the 157 names certified from the 1996 list on September 29, 1998, were appointed to the 119th police academy class, which commenced on August 30, 1999. He also testified that it was his understanding that the remaining candidates from the 1996 eligible list remained certified despite their non-appointment. He drew this conclusion in light of the fact that

---

1. The complaint was later amended to include as plaintiffs eighteen other individuals who were candidates on the 1998 police eligibility list.

they were not appointed to the 119th police academy class and the expiration of the 1996 eligible list. Wilson stated that he did not know how a certified candidate lost certification but stated that certification could be lost at some point.

Wilson acknowledged that, under CSCR 6.60, all regular appointments are required to be accomplished within thirty calendar days following the date of certification. Wilson testified that, as of the time of trial, no appointments had been made to the 120th police academy class. He admitted that the appointments to the 120th police academy class were not made within thirty days of the September 29, 1998 certifications but added that the thirty-day limit for appointments was not met for the 119th, 118th, or 117th police academy classes. He offered the following explanation for the delay:

"[T]he nature of the process for safety forces tells me they will never be able to meet all of those requirements within 30 days. For example, I have to send people through 10 psychological evaluations send them to psychiatrists [*sic*]. There are times when I need a second or third opinion, so I've got people constantly shuffling through the process. And it takes a while to build up enough candidates to put an academy through. Normally it would not happen within 30 days because of the stringent requirements. We have to get candidates through all the processes that are required."

Fred Szabo, Acting Director of Public Safety, testified that, after the 119th police academy class was staffed, there remained certified candidates from the 1996 eligibility list. Szabo testified that, in September 1998, when 157 names were certified from the 1996 eligible list, his office contemplated holding two police academy classes in 1999. In an October 1, 1998 memo to Barry Withers, Executive Assistant to the Mayor, Public Safety Director William Denihan explained his reasons for certifying people from the 1996 eligibility list as potential candidates for the upcoming police academy:

"The Civil Service test which will be given on November 10th [1998] will not be ready for the police to begin their review and evaluations of candidates until approximately March 15 [1999]. It takes at least 3 months after the list is submitted to review the background check, the evaluation, employment record check, criminal record check, address and home background check, physical and psychological. Hence, if we receive the new list March 15th–30th, that puts us at the beginning of July for the first class in 1999, a full 5 months behind, and renders us ineffective in maintaining our personnel levels that we have worked so hard to achieve over the past 4 years. It also puts us behind in the replacement of police officers and the adding of the additional 100 police officers from the Fresh Start Program."

The memo also referred to two planned police academy classes in 1999—one commencing in February and one commencing in August. (See Plaintiff's Exhibit I.) Szabo also testified that the plan for two classes was set forth in the 1999 Mayor's Estimate, which was dated February 1, 1999:

"The budget provides for average uniform staffing level of 1,890 for the year, includes two classes with a total of 160 cadets and maintains all support service levels." (Defendants' Ex. 9—1999 Mayor's Estimate, at 69.)

Szabo explained that the 119th police academy class did not go forward until August 1999 because of budget constraints and, as a result, only one police academy class was convened in 1999:

"We had a demonstration by the Klan which was an unfor[e]seen expense, of literally millions of dollars to fund the reaction to that incident. There was [sic] some disasters that happened in the City during 1999 that just drained our resources and required the City to reallocate monies that originally may have been budgeted for one purpose to another purpose."

As a result, Szabo testified, the city faced possible sanctions from the federal government for failing to meet the personnel baseline upon which their federal funding was premised. He explained that one hundred officers were hired for the Fresh Start program in three phases—each coinciding with the graduation of police academy classes. In the first phase, implemented when the 118th academy graduated, 40 officers were assigned to Fresh Start. The second phase added 29 officers from the 119th academy who graduated on January 20, 2000. Phase three was projected to add 31 additional officers from the 120th class.

Szabo testified that the baseline number would increase as the city put more officers into the Fresh Start program. In Phase I, the required baseline was 1,868 officers. At the time of trial, there were 1,859 officers and the required baseline number was 1,897 officers. In Phase III, scheduled to be completed before December 31, 2000, the baseline would be 1,928 officers.

Szabo testified that the city faced serious sanctions if it failed to meet its baseline of 1,928 officers by the end of 2000, and that the city would be considered in default of its federal grant.

Szabo stated that, in order to meet the personnel baseline by December 31, 2000, the city would have to hold two police academy classes in the year 2000. He started that if the fifteen John Does defendants from the 1996 eligible list were not allowed to attend the 120th police academy, the screening process for candidates would have to be started over again. Due to the length of the screening process, the projected start date of the 120th academy would have to be pushed back several months, which would place the city at risk of not meeting the required personnel baseline for the end of 2000.

The defendants presented testimony from Christopher Cargile and Daniel Engle, two people who were certified on September 29, 1998, from the 1996 eligibility lists. Engle testified that, in November 1999, he received a conditional offer of employment from the Cleveland Police Department. Engle believed that the police academy was to begin in early February 2000, but he never received a call.

The trial court dismissed the Fraternal Order of Police as a plaintiff for lack of standing and dismissed Joseph Musarra for failing to make a written demand upon the city law director before filing suit as required by Section 90 of the Cleveland Charter. The court ruled that the city violated CSCR 5.20, 6.20, and 6.60 by attempting to appoint the John Doe defendants to the 120th academy class. The court also held that, at the time the 1996 eligibility list was certified, there were no vacancies for the 120th academy class because the city had failed to appropriate sufficient funds in 1999 for the 120th academy class. The city was enjoined from appointing anyone from the expired 1996 eligibility list to the 120th academy class or any subsequent Cleveland police academy class.

The court issued a declaratory judgment against the defendants declaring, *inter alia*:

"Defendant Civil Service Commission cannot certify individuals from a valid eligibility list for prospective but undeclared vacancies for a competitive classified civil service position, but rather can only certify individuals from such an eligibility list for validly declared vacancies in that competitive classified civil service position. * * *

"[P]rior to the two-year expiration of the 1996 eligibility list, there were no properly-declared vacancies in the entry level position for police officers in the Cleveland Police Department beyond the 119th class of the Cleveland Police Academy to which Defendants John Does 1–16 could be appointed; and

"[T]he utilization of the 1996 eligibility list to certify, attempt to certify, appoint and/or attempt to appoint Defendants John Does 1–16 to the 120th or any subsequent class of Cleveland Police Academy is in violation of the Civil Service Rules, Charter of the City of Cleveland, and laws of the State of Ohio." (Journal entry of April 3, 2000, at 3–4.)

A motion for relief from judgment filed by Cleveland, Cleveland Civil Service Commission, Cleveland Department of Public Safety, and Henry Guzman was denied by the trial court. This appeal followed.

In their first assignment of error, appellants argue that none of the plaintiffs-appellees had standing to bring the instant action.[2] They point out that no evidence was presented establishing who was on the 1998 eligibility list or that any of the people on that list suffered any harm. They also argue that the plaintiffs-appellees' "eligible" status does not obligate the city to appoint them to a civil service position.

The appellees argue that the verified complaint constituted sufficient evidence for the trial court to determine that the plaintiffs were candidates on the 1998 eligibility list. They also argue that allowing the city to use the 1996 eligibility list would result in the plaintiffs' being denied immediate employment and would impact their future promotions and wages.

A party has standing to request injunctive relief when he has a "personal stake" in the granting of the injunction. *Crestmont Cleveland Partnership. v. Ohio Dept. of Health* (2000), 139 Ohio App.3d 928, 746 N.E.2d 222, citing *Ottawa Cty. Bd. of Commrs. v. Marblehead* (1995), 102 Ohio App.3d 306, 316, 657 N.E.2d 287, 292–293. To establish a personal stake, the party must establish by clear and convincing evidence that he faces an immediate and impending threat of irreparable injury. *Crestmont.* Our review of the trial court's decision on a request for injunctive relief is guided by an abuse-of-discretion standard. *Catawba Orchard Beach Assn., Inc. v. Basinger* (1996), 115 Ohio App.3d 402, 407, 685 N.E.2d 584, 587.

It is the opinion of this court that the named plaintiffs failed to establish standing to seek an injunction in this case. The original complaint listed the names of two people who were allegedly listed on the 1998 eligibility list. Via an amended complaint, the plaintiffs added the names of eighteen additional people who were also alleged to be listed on the 1998 eligibility list. The complaint alleged that "[p]laintiffs and all other individuals certified from or eligible to be certified from a currently valid eligibility list for inclusion in the 120th class of the Police Academy will sustain immediate and irreparable harm if any individual located on the 1996 eligibility list not otherwise legally eligible for inclusion in the 120th class is in fact included in the 120th class inasmuch as there are a finite number of vacancies for the same." However, the plaintiffs failed to produce the 1998 eligibility list or the numerical rankings of the named plaintiffs. In addition, there was no evidence presented that any of the named plaintiffs had or would have completed the medical screening process and background checks that necessarily precede an academy appointment. Under the circumstances, any

---

2. For purposes of this assignment of error, our review is limited to the claims of the eighteen named plaintiffs who were allegedly candidates on the 1998 eligibility list. FOP Lodge 8 did not appeal the trial court's finding that it lacked standing, and the issue of whether Joseph Musarra had standing will be addressed in our discussion of his assignment of error.

assertion that the named plaintiffs would have been appointed to the 120th police academy if not for the inclusion of the John Doe defendants is speculative at best and does not constitute the "personal stake" in the proceedings necessary to demonstrate standing.

■ "In order for one to have standing to raise a particular claim or objection, that party must demonstrate an injury in fact, rather than an abstract or suspected injury." *In re Woodworth* (Dec. 10, 1992), Cuyahoga App. No. 63038, unreported, 1992 WL 369233, citing *State ex rel. Consumers League of Ohio v. Ratchford* (1982), 8 Ohio App.3d 420, 8 OBR 544, 457 N.E.2d 878, at paragraph three of the syllabus. See, also, *Tiemann v. Univ. of Cincinnati* (1998), 127 Ohio App.3d 312, 325, 712 N.E.2d 1258, 1267, citing *Los Angeles v. Lyons* (1983), 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675, 684 ("[A] plaintiff's injury cannot be merely speculative. A bare allegation that plaintiff fears that some injury will or may occur is insufficient to confer standing."); *Johnson's Island Prop. Owners' Assn. v. Schregardus* (June 30, 1997), Franklin App. No. 96APH10–1330, unreported, 1997 WL 360851 ("The alleged injury must be concrete, rather than abstract or suspected."). Appellants' first assignment of error is well taken.

■ Having determined that the named plaintiffs who were allegedly candidates from the 1998 eligibility list lacked standing to file their complaint, and in light of the trial court's uncontested finding that FOP Lodge 8 lacked standing to pursue the action, we must now address the issue raised by Joseph Musarra's assignment of error—whether Joseph Musarra's failure to make a written demand upon the Cleveland Law Director prior to instituting the instant action warranted his dismissal on jurisdictional grounds.

In its journal entry, the trial court dismissed Musarra "on jurisdictional grounds for failing to make a written demand upon the Director of Law of the City of Cleveland." The court found that Musarra violated Section 90 of the Charter of the City of Cleveland, which provides:

"In case the Director of Law, upon written request of any taxpayer of the City, fails to make any application provided for in the preceding three sections, such taxpayer may institute suit or proceedings for such purpose in his own name on behalf of the City. *No such suit or proceeding shall be entertained by any court until such request to the Director of Law shall first have been made, nor until the taxpayer shall have given security for the costs of the proceedings.*"

Joseph Musarra was a "taxpayer, a former employee of the Cleveland Police Department and the immediate past president of Plaintiff FOP 8." Complaint at paragraph 2.

On January 25, 2000, Cornell Carter, Law Director of the city of Cleveland, wrote a letter to Robert Phillips, counsel for FOP Lodge 8, in which Carter responded to an inquiry by Phillips as to whether members from an expired eligibility list could be transferred to a newly created competitive examination list. Carter wrote: "Based upon the foregoing analysis, the prevailing rule of civil service law is that once a certified list is created, the appointing authority can only make appointments from that list. Accordingly, the City of Cleveland must exhaust the current certified list before it requests a new list of potential appointees."

Musarra's failure to personally file a written demand upon the law director is determinative. See Section 90 of the charter. Musarra is mandated by the charter to make a demand upon the law director. His failure to do so is jurisdictional. Accordingly, we overrule Musarra's sole assigned error.

■ In their second assignment of error, the appellants argue that the trial court erred in concluding that no vacancies existed for the 120th academy class. The court found that "the evidence proffered by the testimony of Acting Director of Public Safety, Fred S. Szabo, establishes that, in hindsight, the City of Cleveland did not appropriate sufficient funds for the 120th Police Academy class in the 1999 budget." In opposition to the trial court's conclusion, the appellants argue that the relevant inquiry is whether vacancies existed at the time the candidates were certified. We agree.

CSCR 6.10 provides that before any classified position shall be filled, the appointing authority shall request certification of the names of candidates eligible *for such position.* This language indicates that certifications should be made for the purpose of filling a position that is available at the time the certification is requested. Szabo testified that, in 1998, at the time the certifications were made, the city intended to conduct two police academies in 1999. The 1999 budget submitted to the mayor included two proposed police academy classes for that year—the 119th academy and the 120th academy. He added that only one academy (the 119th) was actually held in 1999 because of unforeseen expenses that forced the reallocation of funds.

■ We agree with the appellants' argument that under *State ex rel. Pell v. Westlake* (1980), 64 Ohio St.2d 360, 18 O.O.3d 514, 415 N.E.2d 289, and *State ex rel. Bardo v. Lyndhurst* (1988), 37 Ohio St.3d 106, 524 N.E.2d 447, once a candidate is certified for budgeted vacancies, a subsequent reduction in budget appropriations does not defeat that candidate's eligibility for the position. As set forth above, our review of the evidence presented at trial reveals that there were vacancies in both the 119th police academy class and the 120th academy class at the time the John Doe defendants were certified on September 29, 1998. Szabo

testified that, at the time, his office contemplated holding two police academy classes in 1999. In an October 1, 1998 memo to Barry Withers, executive assistant to the mayor, Public Safety Director William Denihan wrote that if they waited for the eligibility list from the November 10, 1998 civil service examination, the beginning of the 119th police academy would be delayed at least five months after its scheduled February 1999 start date. He explained that the city would be unable to maintain its police personnel levels, replace officers lost through attrition, or add the additional one hundred police officers to the Fresh Start Program that was funded by a federal grant.

The memo also referred to two planned police academy classes in 1999—one commencing in February and one commencing in August. (See Plaintiff's Exhibit I.) Szabo also testified that the plan for two classes was set forth in the 1999 Mayor's Estimate which was dated February 1, 1999:

"The budget provides for average uniform staffing level of 1,890 for the year, includes two classes with a total of 160 cadets and maintains all support service levels." (Defendants' Ex. 9—1999 Mayor's Estimate, at 69.)

Szabo's testimony made clear that, at the time the John Doe candidates were certified, the city planned to conduct two academy classes for 1999. The fact that subsequent financial problems forced the city to hold only one academy class is not determinative, because there were positions available at the time the John Doe defendants were certified.

In light of this evidence, we must disagree with the trial court's decision that at the time the John Doe defendants were certified, there were no properly declared vacancies in the entry-level position for police officers in the Cleveland Police Department beyond the 119th class of the Cleveland Police Academy to which defendants John Doe 1–16 could be appointed. The rules do not speak of "properly declared" vacancies, but instead refer to "any position" that is to be filled. Furthermore, according to the Glossary to the Civil Service Commission Rules, "certification means that the Civil Service Commission sends to the appointing authority a list of eligibles in the class and grade to which he/she wishes to fill *either new or vacant positions* * * *." (Emphasis added.) The available positions in the 120th academy would obviously qualify as "new" positions for which eligible candidates could properly be certified. Appellants' second assignment of error is well taken.

■ In their third assignment of error, the city argues that the trial court erred in finding that the city violated CSCR 5.20, 6.20, and 6.60. CSCR 5.20 provides that eligible lists shall remain in force not longer than two years. CSCR 6.20 provides: "No request for certification of eligibles or additional names to supplement existing certifications shall be honored by the Commission after the

expiration of such eligible list." The trial court found that the city violated CSCR 5.20 and 6.20 by attempting to include candidates from the expired 1996 eligibility list as members of the 120th police academy. The court also found that the September 29, 1998 certifications ended when the 119th academy class was filled, reasoning that "if an individual did not lose his or her status as a 'certified eligible' candidate for the Police Academy between the time in which separate academy classes are conducted, he or she would never need to be 'certified' again; and Civil Service Rule 6.20, the Rule limiting the number of times an individual could be certified off an eligibility list, would be rendered meaningless."

We agree with appellees that certifications should not last indefinitely:

"The mere fact that an individual performs well on an examination and consequently attains a preferential position on an eligibility list does not justify the indefinite retention of that preferential position. Examinations may be stiffened, additional qualifications be required by additional duties being attached to the position, those examined may deteriorate, others better qualified may knock at the door." *Phillips v. Perkins* (Apr. 13, 1984), Lucas App. No. L–83–258, unreported, 1984 WL 7833.

However, while the rules provide for the expiration of an eligibility list after two years, the rules do not provide that certifications from an eligibility list expire when the list expires. In *Bd. of Trustees of Madison Cty. Children's Home v. State ex rel. Laird* (1934), 128 Ohio St. 560, 1 O.O. 140, 192 N.E. 877, at paragraph three of the syllabus, the court held that the vacation or termination of an eligible list does not vacate or terminate the certified list made from the eligible list while the eligible list was still valid. If we accept the trial court's conclusion that the certifications expired when the 1996 eligible list expired, then all of the certifications from the 1996 eligibility list would have expired on September 30, 1998. Accordingly, all of the appointments to the 119th police academy would be void because they were not made until August 30, 1999, well after the expiration of the 1996 eligibility list. Accordingly, we conclude that the trial court erred in finding that the certifications of the John Doe defendants ended when the 1996 eligibility list expired.

The court also found that the appellants violated CSCR 6.60, which requires appointments to be made within thirty days of certification. However, Wilson testified that the extensive background investigation and medical screening necessary for police academy candidates cannot be completed within thirty days. He added that no candidate for the previous four classes was appointed within thirty days after certification and that it was not possible to complete the prescreening process within thirty days. The court's decision mandates strict compliance with CSCR 6.60. However, in light of the substantial testimony as to

the time-consuming nature of the background checks and medical screening, we agree that strict compliance with CSCR 6.60 is not feasible when appointing police academy candidates:

 "A statute should be given that construction, unless such is prohibited by the letter of the statute, which will accord with common sense and reason and not result in absurdity or great inconvenience." *State ex rel. Webb. v. Bryan City School Dist. Bd. of Edn.* (1984), 10 Ohio St.3d 27, 30, 10 OBR 178, 182, 460 N.E.2d 1121, 1124. See, also, *Canton v. Imperial Bowling Lanes, Inc.* (1968), 16 Ohio St.2d 47, 45 O.O.2d 327, 242 N.E.2d 566, at paragraph four of the syllabus (courts should construe a statute to avoid an unreasonable result); *State ex rel. Brecksville Edn. Assn., OEA/NEA v. State Emp. Relations Bd.* (1996), 74 Ohio St.3d 665, 671, 660 N.E.2d 1199, 1204.

Interpreting the thirty-day time requirement of CSCR 6.60 as mandatory would compromise public safety by prohibiting proper screening of police academy candidates. Accordingly, we disagree with the trial court's ruling that the failure to meet the thirty-day requirement precludes applicants from appointing the John Doe defendants to the 120th police academy.

 We must also disagree with the court's finding that the certifications from the 1996 eligibility list expired once the appointments to the 119th police academy were made. Szabo testified that determining the appropriate number of candidates to certify is not an exact science. The city must certify more candidates than the number of vacancies because many of the candidates will not survive the comprehensive screening process that precedes their appointment to the police academy. Szabo acknowledged that some certified names may be left over after appointments are made but "we try to meter that so that that number is one that we are actually able to reach and put on the department."

In *Blair v. Coey* (1996), 113 Ohio App.3d 325, 328, 680 N.E.2d 1074, 1075–1076, the court held:

"R.C. 124.27 requires that once the appointing authority notifies the civil service commission that he has a position to fill, 'he shall fill such position by appointment of * * * persons certified to him. * * * Appointments * * * shall be made only from those persons whose names are certified to the appointing authority[.]' * * * R.C. 124.27 assumes that the decision to appoint has already been made and does not give the appointing authority the discretion to hold off on the appointment or decide that it should not be made. To hold otherwise would allow for political abuse and would undermine the civil service system. See *Cincinnati ex rel. Simons* [*v. Cincinnati* (1993), 86 Ohio App.3d 258, 263–264, 620 N.E.2d 940, 944]."

Once properly certified, the John Doe defendants should have been appointed to the police academy.

The fact that the appointments were not made within thirty days does not alter our conclusion. CSCR 6.60 states that "all regular appointments *shall* be accomplished within thirty (30) calendar days following the date on which certification is executed by the Commission." Generally, when a statute contains the word "shall," it will be construed as mandatory. When a statute is mandatory, noncompliance will render the proceedings to which it relates illegal and void. However, there is an exception to this rule:

"[E]ven with 'shall' as the operative verb, a statutory time provision may be directory. 'As a general rule, a statute which provides a time for the performance of an official duty will be construed as directory so far as time for performance is concerned, especially where the statute fixes the time simply for convenience or orderly procedure.' * * * This is so 'unless the nature of the act to be performed or the phraseology of the statute or of other statutes relating to the same subject-matter is such that the designation of time must be considered a limitation upon the power of the officer.' " (Citations omitted.) *In re Davis* (1999), 84 Ohio St.3d 520, 522, 705 N.E.2d 1219, 1222.

The Ohio Supreme Court has recognized that time restrictions on the performance of an official duty may be construed as directory when such a construction would serve the purposes sought to be protected by the time limit. *Id.* Civil service laws are designed to protect the public by ensuring that appointments are based upon fitness, competency, and merit, and to protect appointees from being treated arbitrarily and unjustly. *Phillips v. Perkins* (Apr. 13, 1984), Lucas App. No. L–83–258, unreported, 1984 WL 7833. These interests can best be served by allowing the appointing authority such additional time as is reasonably necessary to complete the screening process for potential academy candidates. CSCR 6.60 provides for extending the time period for making appointments for good cause shown. The evidence presented by Wilson and Szabo as to the time-consuming nature of the prescreening process constitutes good cause. Accordingly, we conclude that the trial court erred by finding that appellants violated CSCR 6.60.

We also conclude that the trial court erred in finding that appellants violated CSCR 6.20, as there is no evidence that any of the John Doe defendants were certified more than four times. Appellant's third assignment of error is well taken.

In their fourth assignment of error, the appellants argue that the trial court erred in granting a permanent injunction because none of the plaintiffs demonstrated any harm or injury. They argue that none of the plaintiffs

appeared to testify at trial and that there was no evidence presented that any of the plaintiffs suffered any injury from the city's actions.

In order to qualify for injunctive relief, a plaintiff must demonstrate that the requested injunction is "necessary to protect a clear right from immediate and irreparable harm when any other remedy at law is inadequate." *Sabatino v. Sanfillipo* (Dec. 7, 1999), Franklin App. No. 99AP–149, unreported, 1999 WL 1102718, citing *AgriGeneral Co. v. Lightner* (1998), 127 Ohio App.3d 109, 115, 711 N.E.2d 1037, 1041, discretionary appeal not allowed (1998), 82 Ohio St.3d 1483, 696 N.E.2d 1088. An injury is irreparable when there could be no plain, adequate, and complete remedy at law for its occurrence and when any attempt at monetary restitution would be "impossible, difficult or incomplete." *Cleveland v. Cleveland Elec. Illum. Co.* (1996), 115 Ohio App.3d 1, 12, 684 N.E.2d 343, 350, appeal dismissed (1997), 78 Ohio St.3d 1419, 676 N.E.2d 123, citing *Ohio Turnpike Comm. v. Texaco* (1973), 35 Ohio Misc. 99, 105, 64 O.O.2d 383, 387, 297 N.E.2d 557, 561. Decisions about injunctive relief are within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *Sabatino,* citing *Consun Food Industries, Inc. v. Fowkes* (1991), 81 Ohio App.3d 63, 69, 610 N.E.2d 463, 467, jurisdictional motion overruled (1991), 62 Ohio St.3d 1478, 581 N.E.2d 1099.

As set forth in our discussion of appellants' first assignment of error, we conclude that plaintiffs-appellees failed to demonstrate the irreparable harm necessary for an award of injunctive relief. None of the named plaintiffs produced any evidence that he or she had a clear right to appointment to the 120th academy class that would be immediately endangered by including the John Doe defendants as appointees for the 120th class. Accordingly, appellants' fourth assignment of error is well taken.

Because we find that the trial court's judgment was erroneous, we reverse the judgment of the trial court and vacate the injunction prohibiting the appointment of the John Doe defendants to the police academy. The John Doe defendants are hereby ordered to be appointed to the next police academy, provided that they still meet all necessary medical, psychological, and background screening requirements for such admission.

*Judgment reversed.*

TIMOTHY E. MCMONAGLE, P.J., and KILBANE, J., concur.