CITY OF CINCINNATI ex rel. SIMONS et al., Appellees,

v.

CITY OF CINCINNATI et al., Appellants.

[Cite as *Cincinnati ex rel. Simons v. Cincinnati* (1993), 86 Ohio App.3d 258.]

Court of Appeals of Ohio,
Hamilton County.

No. C–910935.

Decided Feb. 10, 1993.

259

*Manley, Burke & Fischer* and *Timothy Burke,* for appellees.

*Fay D. Dupuis,* City Solicitor, *Richard Ganulin,* Assistant City Solicitor, and *James F. McCarthy III,* Chief Trial Counsel, for appellants.

HILDEBRANDT, Judge.

I

Defendants-appellants appeal the judgment of the Hamilton County Court of Common Pleas in plaintiffs-appellees' taxpayer lawsuit filed pursuant to R.C. 733.59.[1] Appellants include the city of Cincinnati ("city"); Cincinnati Civil Service Commission ("commission"); Cincinnati Board of Health ("board"); and

---

1. R.C. 733.59, in pertinent part, provides:

   "If the village solicitor or city director of law fails, upon the written request of any taxpayer of the municipal corporation, to make any application provided for in sections 733.56 to 733.58 of the Revised Code, the taxpayer may institute suit in his own name, on behalf of the municipal corporation * * *. No such suit or proceeding shall be entertained by any court until the taxpayer gives security for the cost of the proceeding."

Lowery Clark (collectively, "appellants"). Appellees include Earl D. Simons and Logan M. Daugherty (collectively, "appellees"). For the reasons that follow, we affirm the trial court's judgment in part, reverse in part, and remand for further proceedings.[2]

Simons, Daugherty, and Clark have been employed as sanitarians by the board since 1972. In 1979, Simons achieved the grade of senior sanitarian. In 1981, Clark and Daugherty also were promoted to senior sanitarian positions. Shortly thereafter, however, those two promotions were vacated because the eligibility list from which they were made had expired. Nevertheless, after the promotions were vacated, both persons continued to serve for eighteen months in temporary assignments. Subsequently, in August 1984, Daugherty was reappointed to the senior sanitarian position.

On November 4, 1986, in an action related to sanitarian promotions, Cincinnati's city manager issued an administrative regulation to all city department and division heads entitled "Affirmative Action Program Plan and Promotion Justification." This plan required that department heads give the city manager written justification for any extraordinary circumstance in which a person who was not a minority, woman, or handicapped person was to be promoted.[3] Clark is African American; Simons and Daugherty are Caucasian.

In November 1987, after this plan was adopted, a board employee, Alfred Olverson, was promoted from his supervising sanitarian position to an administrative post within the board. That promotion created a permanent vacancy for supervising sanitarian. On May 29, 1986, prior to the Olverson vacancy, the city had conducted a promotional examination for the position of supervising sanitarian. One prerequisite for taking that examination included thirty-six months of experience as a senior sanitarian. Clark, however, had only approximately twenty-five months' senior sanitarian experience, obtained, in large part, in a temporary position following his invalid appointment. Nevertheless, he

---

**2.** The orders from which the appellants bring this appeal are found in the trial court's findings of fact and conclusions of law.

**3.** The regulation reads, in pertinent part:

"[A]ll department and division heads must provide written justification for any proposed promotion if the promotion is not a member of a targeted group outlined in the attached Affirmative Action Program plan. (Targeted groups: minorities, women, handicapped.) * * *

"An example of such a justification would be: There is one vacancy. This is a Division 1 position. There is a Civil Service promotional list. There is a 'Rule of 1' for such vacancy. The person available for appointment is a white male. I had considered waiting until a member of a targeted group would be available for appointment, but there are 23 white males on the list before the first member of the target group is available. The list will expire in six months."

requested that the civil service commission allow him to take the examination. When his initial request was denied, Clark, on May 13, 1986, again sought permission to take the examination, and after two appeals, the commission ruled in his favor.

In addition to Clark, three other persons relevant to this dispute—Simons, Daugherty, and one Robert Evans—sat for the May 29, 1986 supervising sanitarian examination. Prior to the examination, Evans had been injured in an automobile accident during the scope of his employment with the board. As a result of his injuries, Evans was unable to perform his current duties as a senior sanitarian. His injuries, however, did not bar him from sitting for the supervising sanitarian examination. After one year of paid absence and five hundred hours of "light duty," Evans received a physical examination by a city physician. The physician opined that Evans would not be able to perform "the full range of his duties within the foreseeable future." Thereafter, the board informed Evans that it intended to terminate his employment for medical reasons. Evans responded to the board's action by requesting that it delay his termination and "reasonably accommodate" his medical condition for the supervising sanitarian position. Accordingly, the board granted that request.

In the meantime, as required by R.C. 124.26, the city's personnel department prepared an eligibility list based upon the supervising sanitarian examination results for the vacancy created by Olverson's promotion.[4] Among others, that list included Simons, Daugherty, Evans, and Clark. Thereafter, on December 8, 1987, as required by R.C. 124.27, the personnel department certified the three highest ranked names to the board for the purposes of filling the vacancy. Those were Evans, Daugherty, and Simons.[5]

---

**4.** R.C. 124.26 reads, in pertinent part:

"(A) [T]he director of administrative services shall prepare an eligible list of the persons whose general average standing upon examinations for such grade or class is not less than the minimum fixed by the rules of the director, and who are otherwise eligible; and such persons shall take rank upon the eligible list as candidates in the order of their relative excellence as determined by the examination. * * *"

**5.** R.C. 124.27 reads, in pertinent part:

"[T]he director of administrative services * * * shall * * * certify to the appointing authority the names and addresses of the three candidates standing highest on the eligible list * * *.

"The appointing authority shall notify the director of such position to be filled, and he shall fill such position by appointment of one of the three persons certified to him. * * * If an eligible list becomes exhausted, and until a new list can be created, or when no eligible list for such position exists, names may be certified from eligible lists most appropriate for the group or class in which the position to be filled is classified. * * *"

On November 16, 1987, the board assigned Clark to fill temporarily the Olverson vacancy even though his name was not on the certified list.[6] On January 15, 1988, while in the acting supervising sanitarian position, Clark wrote to the commission. In his letter, Clark complained that, because it was uncertain whether Evans would be able to perform the duties of a supervising sanitarian, he, rather than Evans, should have been certified. On January 28, 1988, the commission denied Clark's request; however, it did ask that the board delay appointing the supervising sanitarian until Evans's status was determined. Thereafter, Clark filed a complaint with the Equal Employment Opportunity Commission.

On January 28, 1988, as previously scheduled, the interviews with the three certified employees were conducted. There is evidence in the record to show that even before these interviews, the board had decided not to fill the Olverson vacancy.[7] The interviews were conducted by Olverson, Robert Trentman, and Walter Handy of the board. The trial court stated that two of these men, including Olverson, are African Americans. The commissioner of health and the assistant commissioner of health also are African Americans.

On April 30, 1988, despite his efforts to retain his senior sanitarian position, Evans was terminated for medical reasons. Subsequently, Olverson requested that Evans's name be removed from the certified list and that Clark's name be substituted. Olverson submitted that request to Barbara Stephens, assistant commissioner of health, who forwarded it to Thomas Gamel, the human resource director for the board. On May 12, 1988, Gamel submitted the request to the commission. Consequently, on June 2, 1988, the commission removed Evans's name and added Clark's name. On that same day, the board interviewed Clark and promoted him to the supervising sanitarian position.[8] Despite the seven months that had passed since their original interviews, Simons and Daugherty were not interviewed when the final decision was made.

On June 20, 1988, Simons and Daugherty initiated these proceedings in which they alleged that appellants' actions violated the civil service laws and were an

---

6. The record discloses that Clark's temporary assignment to fill the vacancy violated the city's Personnel Policies and Procedures.

7. The following exchange took place during direct examination of the board's human resource director, Thomas Gamel:
"Q. But why hold the interviews that day if you weren't going to make a decision?
"A. Because the interviews were already scheduled, for one. Two, the Personnel Director downtown said he saw no harm with us continuing on with the interview process. A lot of times interviews are done and decisions aren't made right away, so that's where he thought there would be no harm in doing that."

8. The record reveals that the eligibility list was to expire on June 18, 1988.

abuse of corporate power.⁹ They further claimed they were deprived of due process and equal protection by appellants' actions, which violated Section 1983, Title 42, U.S.Code. More specifically, appellees sought a judgment vacating Clark's appointment, directing the appointment of either Simons or Daugherty, providing back pay, and ordering attorney fees pursuant to Section 1988, Title 42, U.S.Code.¹⁰

Sitting without a jury, on July 26, 1991, the court below tried the matter. At the conclusion of those proceedings, the court granted appellees' demand for an order vacating Clark's appointment. The court also ordered appellants to appoint one of appellees to the supervising sanitarian position. Following further evidentiary material on the remaining matters, the court ordered appellants to pay appellees $20,542.50 in attorney fees and $1,451.67 in costs. From that judgment, appellants bring this timely appeal in which they assert four assignments of error.

## II

For their first assignment of error, appellants claim that the trial court misinterpreted R.C. 124.27, which deals with civil service promotions, by denying them the right to appoint Clark from the second certified list.¹¹ We are unpersuaded.

■ The civil service laws of Ohio are written to provide promotions based on "merit and fitness," not for "political reasons or affiliations." *State ex rel. Buckman v. Munson* (1943), 141 Ohio St. 319, 25 O.O. 455, 48 N.E.2d 109, paragraph one of the syllabus. Even though appellants concede that R.C. 124.27 applies in this case, they contend that the board was entitled to make the appointment from a certified list of three "eligible" candidates. Specifically, appellants sought to remove Evans from the certified list and replace his name with Clark's.

■ In support of their legal proposition, appellants cite *Bd. of Trustees of Madison Cty. Children's Home v. State ex rel. Laird* (1934), 128 Ohio St. 560, 1 O.O. 140, 192 N.E. 877. In *Madison Cty. Children's Home,* one of three

---

9. As noted above, R.C. 733.59 allows a taxpayer to bring action to enforce R.C. 733.56 to 733.58. R.C. 733.56, in turn, provides injunctive relief to prevent, *inter alia,* "the abuse of [the city's] corporate powers."

10. The complaint was amended on June 27, 1988, and advances substantially the same claims. Appellees also filed R.C. Chapter 2505 and 2506 appeals from the actions of the appellants. These appeals were dismissed by the trial court on the appellants' motion.

11. See, *supra,* note 5 for text of R.C. 124.27.

candidates on a certified promotion list died before a final appointment was made. Thereafter, the remaining candidates brought a mandamus action to compel the board to appoint one of the two surviving candidates. The board, in turn, asserted that it would be illegal to appoint from the list of two.

The Ohio Supreme Court observed that, if the board had requested a certified list of three candidates, the commission would be required to meet that demand. *Id.* at 564, 1 O.O. at 142, 192 N.E. at 879. However, since the board had failed to make that request, "appointment made from a certified list of less than three would not be illegal." *Id.* The court further noted that, if the board originally had requested a full certified list of three and the commission had denied that request, it would not order appointment from the remaining two members. *Id.* at 564–565, 1 O.O. at 142–143, 192 N.E. at 879. However, because the board in *Madison Cty. Children's Home* took neither of these actions, the court forced the board to appoint from the original list, which had only two living members. *Id.*

We find the foregoing authority to be inapposite to the appellants' position. Here, the commission's list consisted of three eligible candidates. Appellants admit that Evans was "legally certified * * * to be considered for the position," and that "[w]e had no reason not to interview him at that time." [12] The board's own testimony establishes that it realized that Evans was a viable—"eligible"— candidate for the existing vacancy. This does not mean, however, that appellants were required to appoint Evans. Nonetheless, when appellants delayed seven months in replacing Evans's name with Clark's, they sought to subvert the civil service system by appointing their preordained favorite to the vacancy. Therefore, the trial court did not err when it ordered appellants to fill the Olverson vacancy from the original certified list.

For the foregoing reasons, we overrule appellants' first assignment of error.

## III

In their second assignment of error, appellants maintain that this cause was not properly brought as a taxpayer's action pursuant to R.C. 733.59.[13] Appellants argue that Simons and Daugherty could not pursue this cause under

---

12. *This colloquy occurred during the assistant city solicitor's direct examination of Gamel. It reads:*

"Q. Why include Robert Evans in [the January 28, 1988, interviews] when you're trying to get him medically separated?

"A. Because he was legally certified to the department to be considered for the position. He had rights that still needed to be exercised around reasonable accommodation. We had no reason not to interview him at that time."

13. See, *supra,* fn. 1 for text of R.C. 733.59.

R.C. 733.59 because the relief they sought inured to the benefit of private parties rather than to the public. We do not agree.

In *State ex rel. Caspar v. Dayton* (1990), 53 Ohio St.3d 16, 558 N.E.2d. 49, patrolmen sought to compel the city of Dayton to give credit to union members for vacation time and fringe benefits under a union contract. The court held that, because these benefits were not "public" rights, the suit could not be brought as an R.C. 733.59 taxpayer's action. *Id.* at 20, 558 N.E.2d at 53.

We believe that this case is distinguishable from *Caspar*. In *Caspar*, the city of Dayton had prevailed on at least some of its defenses and was not guilty of bad faith. *Id.* at 20–21, 558 N.E.2d at 54. By way of contrast, the trial court here found that appellants delayed in filling the vacancy to accomplish a preordained result. That delay and the subsequent appointment of Clark constituted favoritism and contravened the Ohio civil service laws. Furthermore, appellants' actions were an abuse of corporate power. Resultantly, the court determined that appellees' lawsuit benefited the city as a whole by protecting the integrity of the civil service system and ensuring its fairness.

From our review of the record, we conclude that the trial court's determinations are supported by competent evidence and, therefore, are not against the weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Accordingly, the second assignment of error is overruled.

## IV

Under their third assignment of error, appellants maintain that the trial court erred by awarding appellees attorney fees in a taxpayer's cause of action (R.C. 733.59 *et seq.*). We disagree.

First, appellants contend that appellees are not entitled to the award because they did not comply with the statutory requirements of R.C. 733.59.[14] Specifically, appellants maintain that appellees did not first request that the city solicitor commence this cause. The trial court found, however, that such a request would have been a vain act because the solicitor's office previously had written legal opinions that opposed appellees' position. Accordingly, this argument fails. See, generally, *State ex rel. White v. Cleveland* (1973), 34 Ohio St.2d 37, 63 O.O.2d 79, 295 N.E.2d 665, paragraph two of the syllabus (when the city's legal office has already taken a position contrary to the taxpayer-plaintiff, the R.C. 733.59 request is excused).

---

**14.** See, *supra*, fn. 1 for text of R.C. 733.59.

Appellants next argue that appellees are not "taxpayers" as contemplated by the statute. The Ohio Supreme Court has held that the term taxpayer, within the meaning of R.C. 733.59, refers to a person who seeks to "enforce a right of action on behalf of and for the benefit of the public." *State ex rel. Nimon v. Springdale* (1966), 6 Ohio St.2d 1, 35 O.O.2d 1, 215 N.E.2d 592, paragraph two of the syllabus. Given our disposition of appellants' second assignment of error, Simons and Daugherty are "taxpayers," and this argument is without merit.

In addition, appellants contend that this action did not inure to the public benefit. We reject that contention here just as we did in the second assignment of error.

Appellants further argue that appellees failed to post security for the cost of the proceeding as required by R.C. 733.59.[15] Because the record shows that appellees posted a security for costs upon filing the complaint, we find this argument to be feckless.

Appellants' final contention is that the trial court's award of attorney fees was inappropriate under Section 1988, Title 42, U.S.Code. This contention fails on the authority of *Cincinnati ex rel. Kuntz v. Cincinnati* (1992), 79 Ohio App.3d 86, 606 N.E.2d 1028 (the party who prevails on state-law claim, which has a common nucleus of operative fact with an unsuccessful Section 1983, Title 42, U.S.Code claim, is entitled to attorney fees under federal law). Accordingly, appellants' third assignment of error is overruled.

## V

In their fourth and final assignment of error, appellants propound the argument that the trial court erred by awarding personal expenses to appellees as "costs" to the prevailing parties. Costs that the trial court allowed and appellants contest, include postage, photocopying, and deposition expenses for court reporter's fees.[16]

---

15. Even though appellants, apparently, have raised this issue for the first time on appeal, we will address this matter because of its jurisdictional implications. See, generally, *State ex rel. Citizens for a Better Portsmouth v. Sydnor* (1991), 61 Ohio St.3d 49, 54, 572 N.E.2d 649, 652 (the trial court does not have jurisdiction to hear an R.C. 733.59 action unless a security was given). We cannot, however, determine from the facts of that case whether it has any application to this issue.

16. The trial court allowed costs of $1,451.67. It did not, however, itemize the specific expenses. Appellants calculate costs as:

| | |
|---|---|
| Photocopying | $ 352.08 |
| Postage | 15.99 |
| Deposition of Olverson | 263.25 |
| Depositions of Handy and Trentman | 45.00 |
| Filing fees | 325.50 |
| Total | $1,001.82 |

Of those costs, the only expenses that appellants do not contest are the $325.50 in filing fees.

Civ.R. 54(D) provides that prevailing parties should normally be awarded the costs of litigation.[17] The Ohio Supreme Court has observed that costs, as the term is generally used in the state, include " 'the statutory fees to which officers, witnesses, jurors and others are entitled for their services in an action * * *.' " *Centennial Ins. Co. v. Liberty Mut. Ins. Co.* (1982), 69 Ohio St.2d 50, 50, 23 O.O.3d 88, 89, 430 N.E.2d 925, 926.[18] The term does not include, however, "fees and disbursements" that are not allowed by statute. *Id.* at 51, 23 O.O.3d at 89, 430 N.E.2d at 926.

In a subsequent case, the court clarified the meaning of "officers" as the term applies to costs. *In re Election of Nov. 6, 1990* (1991), 62 Ohio St.3d 1, 577 N.E.2d 343.[19] The court allowed expenses for court reporters and videotape technicians in depositions because those persons acted as "officers" whose services were included in costs. *Id.* at 4, 577 N.E.2d at 345–346. By way of contrast, attorney fees, travel expenses, copying expenses, delivery charges, computerized legal research, expert witness fees, and telephone bills, were not allowed. *Id.* at 3–4, 577 N.E.2d at 345.

Based upon the foregoing authority, we conclude that the trial court did not err in awarding appellees their deposition expenses. However, we hold that costs for postage and photocopying expenses were improvidently allowed.

## VI

In summation, we overrule appellants' first, second, and third assignments of error. We overrule the fourth assignment of error insofar as it pertains to the award of deposition expenses to appellees. We sustain the fourth assignment only insofar as it pertains to the award of copying and postage expenses. We

17. Civ.R. 54(D) reads:

"Costs. Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."

18. The Ohio Supreme Court recently followed *Centennial* in *Vance v. Roedersheimer* (1992), 64 Ohio St.3d 552, 597 N.E.2d 153.

19. Costs in *Election of Nov. 6* were allowed under the election-contest statute, R.C. 3515.09, which reads in part:

"Said petition shall be accompanied by a bond with surety to be approved by the clerk of the appropriate court in a sum sufficient, as determined by him, to pay all the costs of the contests. * * * [I]f the results of the nomination or election are confirmed or the petition is dismissed or the prosecution fails, judgment shall be rendered against the contestor for the costs; and if the judgment is against the contestee or if the results of the nomination or election are set aside, the county shall pay the costs as other election expenses are paid."

remand this cause to the trial court to determine the amount of appellees' copying and postage expenses and to deduct those expenses from the costs it previously awarded.

*Judgment accordingly.*

SHANNON, P.J., and GORMAN, J., concur.