DECISION.
Defendant-appellant Walt Sweeney Automotive, Inc. ("Sweeney") appeals the judgment of the trial court entered upon a jury's verdict in favor of plaintiffs-appellees Elizabeth and Richard Bryant ("the Bryants") on a claim of fraud in connection with the sale of a used motor vehicle. The Bryants, as cross-appellants, challenge the trial court's calculation of their award of attorney fees. We consider these two appeals together for purposes of this deci sion.
Prior to purchasing a new car, the Bryants saw a Sweeney advertisement in an auto magazine picturing a 1991 Lincoln Continental described as "immaculate, 1 owner, loaded! Leather . . . $5,995." At the bottom of the advertisement was a cash voucher in the amount of $500 towards the down payment on any car on Sweeney's lot. In smaller print, located at the bottom of the voucher, it stated that the $500 was already included in the advertised price. On January 4, 1998, the Bryants went to evaluate the Lincoln and took it for a test drive. The Bryants testified that one of Sweeney's salespersons told them that an empl oyee of the dealership had previously owned the car.
The Bryants decided to purchase the vehicle for the advertised price of $5,995. Although they traded in their van for an $800 credit and made a $3,000 down payment, the Bryants still had to finance $5,576.73 due to the associated products and services that they purchased from Sweeney. These items were as follows: a service contract for $1625; a $15 credit-application fee; a $99 fee for a "VIP card"; a $450 fee for Gap protection; a $200 fee for Safe Guard, a security device; and a $477.84 fee for title registration. The Bryants also purchased credit life and disability insurance from Sweeney in the amount of $435.64, which was added to the price of the sales contract.
The Bryants testified at trial that, when deciding whether to purchase the service contract for the Lincoln, they had expressed a desire for a "warranty" to cover everything, particularly the air-ride suspension. They asserted that Mike Vaughn, Sweeney's finance manager, told them that the service contract they bought did cover everything they wanted. The Bryants were given the opportunity to review the service contract, and both signed it and the purchase agreement.
Once the Bryants took possession of the car, mechanical problems began to occur. The check-engine light came on the next day, and two months later the brakes had to be replaced. Because the Bryants did not get approval from the service-contract provider for the work on the brakes, that expense was not covered. In April, the rack-and-pinion steering needed to be repaired. The Bryants had Sweeney do the work, but one of its mechanics damaged a power-steering line that then had to be replaced at the Bryants' cost. In October, the air conditioning and the rear air-ride suspension failed. When the Bryants brought the car to Sweeney's repair shop, they were told that the damage to the air conditioner had also ruined the condenser, and that while the air conditioner was covered under the service contract, the condenser was not and would cost $500 to repair. The Bryants also learned that the air-ride suspension was not covered under the service contract, and that the cost to repair it would be $1200. At that point, the cost of repairs was more than the value of the car, so the Bryants attempted to trade-in their Lincoln to Sweeney for a 1993 Toyota Camry with 97,000 miles and a cracked sunroof. The Bryants eventually cancelled this transaction when they realized that Sweeney was requiring them to pay off the Lincoln as well as to pay the purchase price for the Camry.
After the brakes failed and before their first loan payment was due on the car, Mr. Bryant called Sweeney to complain that they had not yet received title to the Lincoln, and that he did not want to make a loan payment on the car if he did not have title to it. Mr. Bryant testified that he asked Tim Sweeney, the manager, to cancel the purchase, and that Tim told him he could not do that, but that Sweeney would deliver the title soon. The title was delivered forty-seven days from the date the Bryants had purc hased the Lincoln.
 Because of all the mechanical problems with the Lincoln and their dealings with Sweeney, the Bryants filed suit, alleging breach of contract, fraud and various violations of the Consumer Sales Practices Act, the Motor Vehicle Sales Rule and Consumer Act, the Credit Services Act and Consumer Act, and the Title Defect Act. They also sought punitive damages for the alleged fraud. A jury trial followed, with a verdict in favor of the Bryants in the following amounts:
Consumer Sales Practices Act $11,400
Motor Vehicle Sales Rule and $1500
Consumer Act
Fraud $8700 in compensatory damages
$100,000 in punitive damages
Credit Services Act and $200
Consumer Act
Title Defect Act $200
The jury found in favor of Sweeney on the breach-of-contract claim.
Following the verdict, a separate hearing was held on attorney fees. The trial court awarded the Bryants $25,128.75 in fees. Sweeney then filed a motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, for a new trial. The trial court denied the motion. In Sweeney's appeal, it now asserts seven assignments of error challenging the award of compensatory and punitive damages for fraud and the award of attorney fees. The Bryants assign as error on cross-appeal the cal culation of the attorney-fee award.
 Sweeney's first four assignments of error relate to the trial court's denial of Sweeney's motion for JNOV or, in the alternative, for a new trial. When reviewing a denial of a JNOV, we must construe the evidence most strongly in favor of the nonmoving party and, without weighing the evidence or considering the credibility of the witnesses, determine whether reasonable minds could only come to a conclusion adverse to that party.[1] When reviewing whether the trial court erred in failing to grant a new trial pursuant to Civ.R. 59(A), we must determine whether the court abused its discretion in assessing the weight of the evidence. And if the basis for the motion was a question of law such as the sufficiency of the evidence, we must determine whether the trial court's ruling was erroneous as a matter of law.[2]
In Sweeney's first, second and third assignments of error, respectively, it asserts that the trial court erred in refusing to enter JNOV or to order a new trial, when the court had erroneously charged the jury on the standard of proof necessary to award punitive damages for fraud; when the court had erroneously charged the jury that it could base an award of punitive damages upon a mere finding of fraud; and when there was no clear and convincing evidence that any act of fraud committed by Sweeney was either egregious or malicious. Since the trial court could not enter JNOV based upon the weight of the evidence or for improper jury instructions, the court's only alternative in these respects was to order a new trial. Therefore, the failure to grant the JNOV motion was not erroneous, and we are left to review only the trial court's denial of Sweeney's motion for a new trial. For the following reasons, we hold that the jury instruction regarding punitive damages was erroneous as a matter of law, and, on that basis, we reverse the award of punitive damages and remand for a new trial on that issue.
The issue at trial was whether R.C. 2315.21 was applicable to this action. R.C. 2315.21 sets forth the standard upon which punitive damages may be awarded in a tort action:
 (B) * * * punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:
 (1) The actions or omissions of that defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.
 (2) The plaintiff in question has adduced proof of actual damages that resulted from actions or omissions as described in divisions (B)(1) of
this section.
(C) * * *
 (2) In a tort action, the burden of proof shall be upon the plaintiff in question, by clear and convincing evidence, to establish that he is entitled to recover punitive or exemplary damages.
 At trial, Sweeney objected to the court's instruction to the jury that the burden of proof upon the Bryants to establish that they were entitled to punitive damages was a preponderance of the evidence, arguing instead, in reliance on R.C. 2315.21(C), that the standard was clear and convincing evidence. The Bryants now assert that this statute was inapplicable because the alleged fraud would not have existed unless the parties had entered into an agreement for the purchase and sale of the Lincoln and that this was essentially fraud arising out of a contract rather than a pure "tort." Under these circumstances, the Bryants maintain that they only had to establish by a preponderance of the evidence that they were entitled to punitive damages. The Bryants cite to Johnson v. Stackhouse Oldsmobile[3] for that proposition of law, noting that the factual scenario in Johnson was the same as that in the case sub judice, i.e., an action based on an automobile dealer's misrepresentations concerning a car's previous use and condition. But in Villella v. Waikem Motors, Inc.,[4]
the Ohio Supreme Court cited Johnson for the proposition that, at common law, the standard of proof required for an award of punitive damages was a preponderance of the evidence and observed that the "[Ohio] General Assembly [had] recently enacted R.C. 2315.21(C)(3), which raise[d] the quantum of proof required of the plaintiff to `clear and convincing evidence' in all cases where punitive damages are awarded."[5]
Here, the fraud claim was litigated separately from the breach-of-contract claim, and the fraud cannot be said to have arisen from the alleged breach of contract, when the jury returned a verdict for the Bryants on the fraud claim, but against them on the claim for breach of contract. Thus, as fraud is a tort, and R.C. 2315.21 governs tort claims, the trial court should have instructed the jury that the Bryants bore the burden of establishing their right to punitive damages by clear and convincing evidence.[6]
Sweeney also asserts that the court erred by instructing the jury that they could award punitive damages merely upon a finding of fraud. Regarding punitive damages, the jury was charged as follows:
 If you find for the plaintiffs, and award actual damages on this claim [of fraud], then you may also consider whether you will separately award punitive damages. If you do not find actual damages, you cannot consider punitive damages.
 If you find that the defendant car dealer acted unlawfully, or fraudulently, or willfully, or wantonly, or maliciously, or with reckless disregard for the truth, then you may return a verdict which will not only include compensatory damages, but also punitive damages as to this claim [of fraud].
 A trial court must give jury instructions that provide a correct, clear and complete statement of the law.[7]
In reviewing jury instructions, we must consider the totality of the jury charge in determining whether a portion of it was prejudicial. "A jury charge is considered prejudicial if it `probably misled the jury in a matter materially affecting the complaining party's substantial rights.'"[8]
A review of the jury charge reveals that the trial court erroneously instructed the jury that it could award punitive damages if it found merely that Sweeney had acted fraudulently. This was not a clear and accurate statement of the law. The trial court further compounded this error by having the jurors respond to special interrogatories, one of which stated that "if you answered yes to Question 5 [that Sweeney committed fraud], then what is the amount of punitive damages which you award to plaintiffs." This interrogatory misled the jury and implied that if they had found that Sweeney had committed fraud, then they could automatically award punitive damages without finding by clear and convincing evidence that the fraudulent acts were done with malice or were particularly egregious.[9]
The jury charge regarding punitive damages was neither complete nor accurate. Accordingly, we conclude that the jury was misled as to the evidence necessary to establish an entitlement to punitive damages and as to the standard of proof to be applied when evaluating the evidence supporting such an award. Because these erroneous instructions misled the jury in matters materially affecting Sweeney's rights, we conclude that these instructions were prejudicial to Sweeney.[10] Under these circumstances, the trial court erred in denying Sweeney's motion for a new trial.[11] Accordingly, we sustain the first and second assignments of error.
Our resolution of the first and second assignments of error renders moot Sweeney's third assignment of error. We, therefore, do not reach the merits of the third assignment.[12]
In its fourth assignment of error, Sweeney contends that the trial court erred in denying its motion for JNOV or, in the alternative, for a new trial, because there was insufficient evidence to support a finding of fraud. We disagree.
Throughout the trial, the Bryants referred to many different actions and omissions by Sweeney that, they alleged, amounted to fraud. Although the jury found that Sweeney was liable for fraud, it did not indicate the specific actions or omissions of Sweeney or its agents that constituted the fraud. Attached to the Bryants' response to Sweeney's motion for JNOV was a chart that listed six acts or omissions that the Bryants believed demonstrated fraud. This chart was used at trial to help the jury, but it was not admitted into evidence. In addressing this assignment of error, we focus on the six acts or omissions identified on the chart. Our review of the record reveals no other acts or omissions by Sweeney that amounted to fraud.
 The Bryants were required to prove the following elements to establish their claim of fraud:
 a representation or, where there is a duty to disclose, concealment of a fact,
 which is material to the transaction at hand, made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred
 with the intent of misleading another into relying upon it,
 justifiable reliance upon the representation or concealment, and
 a resulting injury proximately caused by the reliance.[13] A failure to prove one of the elements would have been fatal to their claim.[14]
The Bryants first asserted that Sweeney had acted fraudulently when it failed to deliver the title to the Lincoln within the time required by law (forty days from the date of purchase). Sweeney admits that it did not deliver the title to the Bryants in a timely manner. While Sweeney was liable to the Bryants under the Title Transfer Law for this failure, Sweeney did not act fraudulently in this respect. There was no evidence submitted that the Bryants suffered injury from their reliance on Sweeney's representation that it would deliver the title to them. The Bryants eventually did receive the title, and Mr. Bryant testified that they were "okay with [the title]."
The second act of fraud alleged by the Bryants was Sweeney's misrepresentation in its advertisement for the Lincoln that the Lincoln was a "one-owner." Tim Sweeney, the manager of Sweeney, admitted that the Lincoln had had more than one previous owner, and that the "one-owner" statement was mistakenly placed in the advertisement. He also testified that there was no intent to mislead the Bryants into relying on the statement. The court left it to the jury to determine whether Tim Sweeney's testimony was credible, and whether the "one-owner" statement had been placed in the advertisement mistakenly, without the intent to mislead.
The intent to mislead can be inferred or presumed, depending on the facts and circumstances of the case.[15] From our review of the record, the jury reasonably could have disbelieved Tim Sweeney's testimony. There was expert testimony presented at trial from David Stivers, an auto-industry consultant, who stated that no action taken by auto dealerships (including Sweeney) in the process of selling a car occurred by accident. Stivers testified that auto dealerships knew that the phrase "one-owner" indicated to customers that a car had been well maintained, and that dealerships used that common term to entice customers to purchase a vehicle.
Here, Sweeney admitted that it knew the Lincoln was not a "one-owner." But Sweeney itself had designed the advertisement and had specifically inserted under the picture of the Lincoln the statement that it was a "one-owner." This description was not placed under any other car pictured for sale in the advertisement. The Bryants also testified that a Sweeney salesperson told them that a "girl" who had worked at the dealership had been the only previous owner of the Lincoln. Finally, Sweeney was found liable for deceptive acts, as that phrase is defined under the Consumer Sales Practices Act. While those deceptive acts might not have amounted to fraud, those actions or omissions provided circumstantial evidence upon which the jury could have relied to presume an intention on the part of Sweeney to mislead the Bryants.
The record also demonstrates that the Bryants relied on Sweeney's intentional misrepresentation. Mr. Bryant testified that he relied on the "one-owner" representation. He reasoned from the representation that the car had been well maintained, because the "girl," who had owned the car, as an employee of Sweeney, was likely to have serviced the car at a discount. Evidence of the numerous mechanical problems that arose immediately after the Bryants had taken possession of the Lincoln demonstrated the damages suffered by the Bryants from their reliance on the "one-owner" representation. Accordingly, we conclude that there was competent, credible evidence to support a finding of fraud in this instance.
The Bryants also alleged that Sweeney had committed fraud by representing in the advertisement for the Lincoln that a purchaser could use a $500 cash voucher toward the down payment on the Lincoln. The fine print of the voucher accompanying the advertisement for the Lincoln stated that the $500 discount was already included in the advertised price of the car. The Bryants testified that they had been informed of this before they purchased the Lincoln and had agreed to the advertised price of $5,995, which included the $500 discount. The Bryants, therefore, did not rely on the cash voucher in purchasing the Lincoln, and thus a finding of fraud was not supported in this respect.
The Bryants also asserted that Sweeney had acted fraudulently when Tim Sweeney told Mr. Bryant that the dealership could not cancel the purchase agreement even though Sweeney had not yet delivered the title to the Bryants. Both parties agreed at trial that, as a matter of law, the Bryants had the right to cancel the transaction if they had not yet received the title to the Lincoln. Mr. Bryant testified that he had called Tim Sweeney because his temporary tag was about to expire, and because he had still not received the title to the Lincoln. Mr. Bryant testified that Tim Sweeney had told him that the dealership could not cancel the sale, and that it would get the title to him shortly. Tim Sweeney testified that he did not remember Mr. Bryant asking to cancel the sale, and that he would have done so if the Bryants had asked.
There was conflicting testimony regarding what was represented to Mr. Bryant regarding the cancellation of the sale. In this situation, we defer to the trier of fact's finding because the trier of fact was "best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony."[16] Accordingly, there was competent, credible evidence to support a finding that Sweeney had misrepresented to the Bryants their right to cancel the sale. Furthermore, the jury could reasonably have found that Sweeney knew that this representation was false, because Tim Sweeney testified that Sweeney had been in the auto business for over twenty years, and that he was familiar with the law governing auto dealerships. Again, the jury could reasonably have found, based on other circumstantial evidence in the record, that Sweeney had intended to mislead the Bryants and that the Bryants had relied on this misrepresentation and had suffered damages. The Bryants had to pay for the car in full and for the many repairs needed on the Lincoln. Thus, we hold that the evidence supported a finding of fraud in this instance.
The Bryants also claimed that Sweeney's alleged act of falsifying a state title document amounted to fraud. The record demonstrates that Sweeney sold the Lincoln to the Bryants when Sweeney did not have the title to the car. While trying to get the title from the previous owner, the dealership had to complete an "out of state motor vehicle inspection" form. A Sweeney employee completed the form, indicating that she had personally inspected the car and the car's mileage, year, make and model. She then signed the form and dated it. The Bryants argued that this form implied that Sweeney had inspected the car on the date that the form was signed, and that such an inspection would have been impossible because the Bryants were already in possession of the car. Regardless of whether Sweeney actually inspected the Lincoln on the date stated on the form, the information regarding the Lincoln was correct. Moreover, the Bryants received a proper title to the Lincoln without knowledge that the form had been completed. Thus, they could not have relied on it. Accordingly, this act did not amount to fraud against the Bryants.
 Finally, the Bryants asserted that Mike Vaughn, the business manager for Sweeney, had intentionally misrepresented to them that the service contract they purchased from Sweeney for the Lincoln covered the air-ride suspension. Mr. Vaughn testified that he did not remember the transaction, but, instead, based his testimony upon his review of the paperwork signed by the Bryants when they purchased the Lincoln. Both Mr. and Mrs. Bryant signed the service contract, indicating that they had read the contract and agreed to be bound by it. The service contract did not state that the air-ride suspension was covered. A party cannot maintain an action for fraud where the alleged fraud is directly contradicted by a signed writing.[17]
Accordingly, there was no evidence of fraud here.
In sum, we hold, after construing the evidence in a manner most favorable to the Bryants, that there was competent, credible evidence to support a finding of fraud with respect to Sweeney's misrepresentation that the Lincoln had had only one previous owner and had been well maintained and with respect to Sweeney's misrepresentation that it was unable to cancel the sale, even though the title had not been delivered to the Bryants. Thus, the jury's award of compensatory damages was proper, and the fourth assignment of error is overruled.
In its fifth assignment of error, Sweeney asserts that the jury's verdict was tainted by passion and prejudice and, thus, that the trial court erred in not granting Sweeney's motion for a new trial. After opening arguments, the court bailiff overheard a juror say, "This is a sexual case. Somebody got screwed." The bailiff instructed the jury to refrain from talking about the case during breaks in the trial. The comment was brought to the attention of both parties' counsel, and they decided that the trial court should just admonish the jury not to talk about the case. Sweeney did not object and ask for a mistrial, but proceeded to defend its position on the merits. Because Sweeney did not object, we review this assignment under the plain-error standard. We conclude that there was no prejudice to Sweeney, because the trial court instructed the jury to refrain from talking about the case until deliberations began, and because the verdict was supported by competent, credible evidence, as discussed in the previous assignment of error. Accordingly, the trial court did not err in denying the motion for a new trial. Thus, the fifth assignment of error is overruled.
In its sixth and seventh assignments of error, Sweeney asserts that the trial court erred in awarding attorney fees for claims that did not arise under R.C. Chapter 1345, the Consumer Sales Practices Act ("CSPA"). Specifically, Sweeney maintains that the trial court should not have awarded the Bryants attorney fees for the time spent litigating their claims for fraud and punitive damages. We disagree.
The Ohio Supreme Court has held that where claims can be separated so that there is one under the CSPA, for which attorney fees may be awarded, and others for which no fees are recoverable, the trial court must only award fees for the time spent pursuing the CSPA claim.[18]
But this court, following Hensley v. Eckerhart,[19] has held that when it is not possible to divide claims in this fashion, such as when claims not covered under the CSPA involve a common core of facts with claims arising under the CSPA, then the court may award attorney fees for all time reasonably spent pursuing all claims.[20] Because the Bryants' claim of fraud, and even their pursuit of punitive damages, involved a common core of facts with their CSPA claims, we conclude that it was proper for the trial court to treat the total number of hours expended on all claims as reasonably compensable hours. Sweeney's sixth and seventh assignments of error are overruled.
The Bryants, in their cross-appeal, challenge the amount awarded for attorney fees. They raise five different issues under their single assignment of error, which we address in turn.
Before discussing each issue, we note that a reviewing court may not reverse an award of attorney fees absent an abuse of discretion.[21]
The trial court abuses its discretion and acts unreasonably when the amount of fees awarded is "so high or so low as to shock the conscience."[22]
The Ohio Supreme Court has held that when awarding attorney fees pursuant to R.C. 1345.09(F)(2), the trial court should first calculate the number of hours reasonably expended on the case multiplied by an hourly fee, and then the court may modify that calculation by application of the factors listed in DR 2-106(B).[23] Those factors include the following:
 The time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent.[24]
 The trial court awarded the Bryants $25,128.75 in attorney fees. The court arrived at this figure by multiplying an hourly fee of $125 by the 201.03 hours expended by the Bryants' attorney in handling this litigation.
The Bryants first argue, in support of their assignment of error, that the trial court erred in calculating the hourly fee at $125, when evidence was submitted at the fee hearing to demonstrate that a reasonable rate for an attorney litigating CSPA claims in the Dayton/Cincinnati, Ohio area was $225 to $250 per hour. In its decision, the trial court noted that $225 to $250 per hour was a reasonable rate, and that the Bryants' attorney, Ronald Burdge, was a prominent lawyer in this field. But, the court noted, Burdge, based on a review of billing statements, had only charged the Bryants $125 per hour; Mr. Bryant testified that he had only paid $125 per hour and that he did not expect to pay the remaining $125 per hour if he lost at trial; and Burdge testified that he was not sure if he would even collect the remaining $125 per hour from the Bryants. Based on this record, we cannot say that the $125 per hour rate was "so low as to shock the conscience." Thus, we cannot conclude that the trial court abused its discretion in setting the hourly rate at $125.
The Bryants also assert that the trial court erred in not awarding attorney fees for the 35 hours that Burdge spent in preparation for the contested attorney-fee hearing. We conclude that the trial court did not abuse its discretion in this respect because the time was not spent in "direct pursuit of a consumer sales practices act violation."[25]
The Bryants also maintain that the costs of litigation should have been included in the award of attorney fees. The Bryants argue that expert-witness fees and expenses in the amount of $7,293.50 and litigation expenses in the amount of $4,660.68 should have been taxed as costs and included in the award of fees. The litigation expenses included not only the expert-witness fees, but also charges for photocopying, facsimiles, mileage, parking, computerized legal research, postage, trial exhibits, a trial transcript, and deposition transcripts. The Ohio Supreme Court has held that litigation expenses cannot be taxed as "costs," unless specifically provided for by statute.[26] The Bryants have not provided, nor have we found, any statutory authority requiring that the foregoing itemized expenses be treated as costs.[27]
Accordingly, the trial court did not abuse its discretion in refusing to calculate "costs" in the award of attorney fees.
Finally, the Bryants argue that the time expended by paralegals on their case should have been included in the award of attorney fees. At the fee hearing, the Bryants asked that the court award $75 per hour for 118.44 hours of time reasonably expended by paralegals. We are unaware of any case law providing that paralegal expenses may be included in an award of attorney fees under R.C.1345.09(F)(2). R.C. 1345.09(F)(2) specifically allows only for "a reasonable attorney fee," not for non-attorney fees. Although the Bryants presented extensive charts detailing the time expended by paralegals on this case, which demonstrated that the paralegal time could have been separated from the attorney time expended, there was testimony elicited during the cross-examination of Mr. Burdge and Mr. Bryant that the Bryants' bills did not reflect any charges for paralegal time. Nearly every item on the Bryants' invoice was billed at the $125-per-hour rate. Mr. Burdge indicated on cross-examination that he did not do the billing, and that the billing could have reflected a blended rate. Based on these facts, we cannot conclude that the trial court abused its discretion in failing to include paralegal expenses in an award of attorney fees. Accordingly, the Bryants' cro ss-assignment of error is overruled.
In sum, we affirm the award of attorney fees and the award of compensatory damages for fraud, but reverse the award of punitive damages and remand this case for a new trial on punitive damages only, with instructions to the trial court to charge the jury on the correct standard of proof necessary, pursuant to R.C. 231 5.21(C), to support an award of punitive damages.
Judgment affirmed in part and reversed in part, and cause remanded.
Hildebrandt, P.J., Sundermann and Winkler, JJ.
[1] Osler v. Lorain (1986), 28 Ohio St.3d 345, 504 N.E.2d 19; Sheidlerv. Norfolk W. Ry. (1999), 132 Ohio App.3d 462, 725 N.E.2d 351.
[2] See Rohde v. Farmer (1970), 23 Ohio St.2d 82, 262 N.E.2d 685.
[3] (1971), 27 Ohio St.2d 140, 271 N.E.2d 782.
[4] (1989), 45 Ohio St.3d 36, 543 N.E.2d 464, overruled on other grounds in Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638,635 N.E.2d 331.
[5] Id. at 38, 543 N.E.2d at 467, fn. 2.
[6] See Wallace v. Sunstar Acceptance Corp. (May 12, 2000), 1st Dist. Nos. C-990390 and C-990424.
[7] See Sharp v. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307,312, 649 N.E.2d 1219; Marshall v. Gibson (1985), 19 Ohio St.3d 10,12, 482 N.E.2d 583.
[8] Becker v. Lake County Memorial Hospital West (1990),53 Ohio St.3d 202, 208, 560 N.E.2d 165; Stojkovic v. Avery Thress,M.D., Inc. (May 28, 1999), 1st Dist. No. C-970279.
[9] R.C. 2315.21(C); Sunstar, supra.
[10] See Apling v. Lamberjack (Sept. 20, 1996), 6th Dist. No. OT-95-048.
[11] See Civ.R. 59(A)(9).
[12] See App.R.12(A).
[13] Amerifirst Savings Bank of Xenia v. Krug (1999),136 Ohio App.3d 468, 490-91, 737 N.E.2d 68.
[14] See Miller v. Knight (1961), 115 Ohio App. 485, 487,185 N.E.2d 770.
[15] See Jenkins v. Clark (1982), 7 Ohio App.3d 93, 101,454 N.E.2d 541.
[16] Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273.
[17] See Fontbank, Inc. v. CompuServe, Inc. (2000), 138 Ohio App.3d 801,742 N.E.2d 674.
[18] Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143,145, 569 N.E.2d 464.
[19] (1983), 461 U.S. 424, 103 S.Ct. 1933.
[20] Parker v. I F Insulation Company, Inc. (Mar. 27, 1998), 1st Dist. No. C-960602.
[21] Parker, supra.
[22] Bittner, supra, at 146, 569 N.E.2d at 467.
[23] Id., syllabus.
[24] Id. at 145-146, 569 N.E.2d at 467.
[25] Creameans v. Robbins (June 12, 2000), 4th Dist. No. 99-CA-2520;Tanner v. Tom Harrigan Chrysler Plymouth, Inc. (1992), 82 Ohio App.3d 767,769, 613 N.E.2d 650.
[26] See Centennial Ins. Co. v. Liberty Mutual Ins. Co. (1982),69 Ohio St.2d 50, 430 N.E.2d 925; Cunningham v. Goodyear Tire RubberCo. (1995), 104 Ohio App.3d 385, 662 N.E.2d 73.
[27] See Parker, supra (where this court specifically held that expenses for photocopies, long-distance phone calls, exhibits and expert-witness fees may not be taxed as costs); Cincinnati ex rel. Simonsv. Cincinnati (1993), 86 Ohio App.3d 258, 620 N.E.2d 940.