OPINION
{¶ 1} Defendants-appellants, Capstone Holding Company (Capstone) and Loy Reclamation Project (Loy), appeal from the decision of the Belmont County Court of Common Pleas: (1) declaring that plaintiffs-appellees, Consolidated Land Company (Consolidated) and Belmont Coal, Inc. (Belmont Coal), have express rights to mine and remove certain coal beneath appellants' surface land; (2) enjoining appellants from constructing and/or operating a landfill on the property at issue and from interfering with appellees' mining; and (3) declaring that appellees shall be liable for damages, if any, to Capstone's surface land caused by mining operations.
 {¶ 2} This case deals with a dispute between the surface owners of several parcels of property and the subsurface coal owners of the same property. Consolidated is the owner of the subsurface coal estates. It also owns the surface rights and privileges "needful or useful" and "proper and necessary" to mine and remove the coal. The coal-mining rights were severed from the surface estates by three deeds. The First Deed was recorded December 7, 1901 at Volume 136, page 45 of the records of Belmont County Recorder's Office (First Deed). The Second Deed was recorded December 7, 1901 at Volume 136, page 47 of the records of Belmont County Recorder's Office (Second Deed). The Third Deed was recorded October 16, 1907 at Volume 169, page 430 of the records of Belmont County Recorder's Office (Third Deed). Consolidated acquired the coal-mining rights in 1995. Consolidated leased the coal estates to Belmont Coal, who now wishes to mine the coal. Capstone acquired the surface estates, which overlay the coal estates, in 1999. In January 2000, Loy contracted with Capstone to purchase the surface estates upon which Loy plans to construct and operate a construction and demolition debris (CDD) landfill.
 {¶ 3} On March 26, 2001, Consolidated filed a complaint for a declaratory judgment and preliminary and permanent injunctive relief against appellants. Consolidated asked the court to declare, recognize and protect certain mineral and surface rights it held in the Pittsburgh No. 8 coal seam underneath surface estates owned by Capstone. Consolidated requested that the court issue an injunction to prevent Loy from constructing the proposed CDD landfill on Capstone's property. Capstone filed a counterclaim for declaratory judgment requesting that the court declare the extent of its surface rights in an area known as the McKelvey Deed land. Belmont Coal was later joined as a party-plaintiff.
 {¶ 4} The case proceeded to a bench trial in November of 2001. The following facts are gathered from the trial court's Findings of Fact and Conclusions of Law in Support of Decision of Court of April 1, 2002 (Findings Conclusions).
 {¶ 5} When Capstone acquired the surface estates, the land was subject to a reclamation obligation from the Ohio Department of Natural Resources (ODNR) because the surface estates had been strip-mined. When Loy purchased the surface estates, it could not begin construction of the CDD landfill because the reclamation obligation had not yet been satisfied. In September 2000, Loy applied to the Ohio Environmental Protection Agency (OEPA) for a CDD landfill license. The OEPA issued Loy a license on February 23, 2001 to construct and operate a CDD landfill on the surface estates. Per OEPA regulations, Loy applied for a renewal of said license in September of 2001. Because of an appeal with the Environmental Review Appeals Commission, Loy's license was vacated and remanded back to the OEPA. In June 2001, Belmont Coal applied to the ODNR for a permit to mine the coal using the longwall method.[1] Appellees assert that the longwall method is the only way they can mine all of the coal economically thereby making the longwall method both "needful or useful" and "proper and necessary."
 {¶ 6} Loy's planned CDD landfill would be located above Belmont Coal's mines. Appellees presented evidence that the placement of the proposed landfill would impermissibly interfere with longwall coal mining. Belmont Coal is required to submit a subsidence control plan to the ODNR with its mining application and must demonstrate that it can repair or remediate damage caused by subsidence. Appellees presented evidence that Belmont Coal cannot propose any subsidence plan for longwall mining under which it will be able to repair the damage it will cause to the landfill structure. Appellees' evidence demonstrated subsidence would crack or fracture the landfill's soil liner and leachate collection system allowing the leachate to leak into the ground water.[2]
Appellees' evidence revealed they could not repair or prevent the damage subsidence will cause to a landfill and the subsequent water pollution. Therefore, the trial court found appellees proved the ODNR would deny Belmont Coal's longwall mining application. (Findings Conclusions, paragraph 91, p. 16). If Belmont Coal cannot mine by the longwall method, its ability to mine the coal beneath the landfill will be eliminated. (Findings Conclusions, paragraph 96, p. 17).
 {¶ 7} Based on this evidence, the trial court issued the following rulings in its April 1, 2002 judgment entry. It declared that, per the First, Second, and Third Deeds, appellees have express rights to mine and remove all of the No. 8 coal seam under appellants' surface as well as superior mining rights and privileges that permit appellees to impact upon appellants' surface rights when using "needful or useful" and "proper and necessary" methods incidental to the coal mining. It issued a permanent injunction enjoining appellants from constructing and/or operating a CDD landfill on the property at issue and/or using the property in a manner which otherwise interferes with appellees' right to mine all of the No. 8 coal seam and its appurtenant property rights to impact the surface when using "needful or useful" and "proper and necessary" methods incidental to the mining. Finally, the court declared Capstone is entitled to rights of subjacent or lateral support to the surface of the land described in the McKelvey Deed and appellees shall be liable for damages, if any, to the surface of the land that are caused by appellees' failure to leave the required support. It is from this decision that appellants filed their timely notice of appeal on April 25, 2002.
 {¶ 8} Appellants raise two assignments of error, the first of which states:
 {¶ 9} "THE TRIAL COURT ERRED IN ITS ORDER OF APRIL 1, 2002 IN ITS DECLARATION OF THE PROPERTY RIGHTS HELD BY CONSOLIDATED LAND COMPANY AND BELMONT COAL, INC. AND BY PERMANENTLY ENJOINING CAPSTONE HOLDING COMPANY AND LOY RECLAMATION LLC FROM CONSTRUCTING AND OPERATING A CDD LANDFILL ON 270.7678 ACRES OF LAND LOCATED IN BELMONT COUNTY, OHIO."
 {¶ 10} Appellants broke down their first assignment of error into four distinct issues, which we will address separately. The first issue states as follows:
 {¶ 11} "The trial court erred in finding that the coal deeds at issue demonstrate that the grantor waived its right to make lawful uses of the surface if those uses would prevent the coal mine operator from obtaining a permit to mine from the State."
 {¶ 12} Appellants note that the statutory scheme requiring coal mine operators to demonstrate that their proposed method of mining will not result in significant environmental harm or unmitigated damage to surface structures in order to receive a permit did not come into effect until 70 years after the mineral rights in this case were severed. Citing, R.C. 1513.35(C); Ohio Admin. Code 1501:13-12-03. They assert that the language in the First, Second, and Third Deeds does not support the coal miner's attempt to prevent development in order to comply with such statutory schemes. Appellants also assert the trial court relied too heavily on certain language in these Deeds. The court focused on the facts that the First, Second, and Third Deeds: (1) grant "all" of the No. 8 coal to the grantee; (2) grant the ability to conduct mining operations; and (3) waive damage to the surface that may be caused by subsidence. (April 1, 2002 Judgment Entry). Appellants claim that the trial court construed these provisions in these Deeds too broadly. For example, appellants argue that just because appellees own "all" of the coal, this does not create a right to mine all of the coal by any means sought. Citing, Graham v. Drydock Coal Co. (1996), 76 Ohio St.3d 311,316. Additionally, they argue that the waiver provision only takes away their right to sue if damage occurs to the surface; it does not give the trial court the right to restrict how they use the surface land.
 {¶ 13} Appellants next assert the First, Second, and Third Deeds do not restrict the surface owner in any way from carrying on with lawful surface uses. They argue there is no guarantee that appellees will ever mine the coal in question for any number of reasons having nothing to do with a landfill. Therefore, appellants contend they should not be restricted from using their property in the manner in which they choose. Finally, appellants argue that the ability to get a permit is not the equivalent of a property right to access the coal. They note that generally, a property owner may use his or her property for any lawful use.
 {¶ 14} Here appellants challenge the trial court's interpretation of the First, Second, and Third Deeds, which originally severed the coal estates. The construction of written contracts and instruments, including deeds, is a matter of law, which we review de novo. Long Beach Assn.,Inc. v. Jones (1998), 82 Ohio St.3d 574, 576. This court presumes that the deed expresses the intention of the grantor and grantee at the time that they executed the deed. Parker v. Parker (Sept. 28, 2000), 4th Dist. No. 99CA845. If the language of the deed is clear and unambiguous, we cannot interpret the parties' intent to the contrary. Id.
 {¶ 15} The pertinent language in the Deeds is as follows. The First Deed granted Consolidated's predecessors an interest in the following coal estate:
 {¶ 16} "* * * all of the six-foot, or No. 8, or Pittsburgh vein or stratum of coal, commonly known as the No. 8 vein, according to Geological Reports of the State of Ohio." (Emphasis added.) (Joint Exh. 2).
 {¶ 17} The First Deed further granted to Consolidated's predecessors:
 {¶ 18} "Together with all the rights and privileges needful oruseful to said Grantee, his heirs and assigns, for digging, mining,draining, ventilating, removing and carrying away said coal, and with the rights and privileges of digging, mining, draining, ventilating, removing and conveying away all other coal which belongs to or is controlled, under lease or otherwise, or which hereafter may be acquired or controlled, under lease or otherwise, by said Grantee, his heirs and assigns. Also the right and privilege to construct and maintain shafts, drifts and openings for the purpose of aforesaid, but such openings are to be in ravines or waste places upon said land not nearer than 500 feet of the principal buildings thereon, and said Grantors hereby waive anyand all damages arising from the exercise of all and singular the rightsand privileges herein before granted. Any surface necessary for shafts of any kind, drifts, openings, or for other purposes needful in the digging, mining, draining, ventilating, removing and carrying away of said coal shall be paid for by said Grantee, his heirs or assigns, at the rate of One Hundred dollars per acre, and said Grantors for the consideration of aforesaid, hereby agree to convey, by general warranty deed, to said Grantee, his heirs and assigns, not less than one-half acre of said surface upon request and payment therefore by said Grantee, his heirs and assigns."
 {¶ 19} "Grantors their heirs or assigns, reserve the right to dig drill, or bore through said coal for oil and gas, or other minerals, said digging, drilling or boring not to interfere with the mining of saidcoal." (Emphasis added.) (Joint Exh. 2).
 {¶ 20} The Second Deed granted Consolidated's predecessors the identical, pertinent rights with respect to another parcel. (Joint Ex. 3).
 {¶ 21} The Third Deed granted Consolidated's predecessors the following coal estate:
 {¶ 22} "* * * all of the six-foot, or No. 8, or Pittsburgh vein or stratum of coal, commonly known as the No. 8 vein, according to the Geological Reports of the State of Ohio." (Emphasis added.) (Joint Exh. 4).
 {¶ 23} The Third Deed further granted Consolidated's predecessors the following rights:
 {¶ 24} "Together with the free and uninterrupted right of wayinto, upon or under said land, at such points and in such manner as maybe proper and necessary for the purpose of digging, mining, coking,draining and ventilating, and carrying away said coal, together with the privilege of mining and removing through said described premises, other coal belonging to said grantee, his heirs and assigns or which may hereafter be acquired by him. (Hereby waiving all surface damages ordamages of any sort arising therefrom, or from the removal of all of saidcoal), and it is understood and agreed that no surface is to be taken for any purpose whatever.
 {¶ 25} "Said grantors, their heirs and assigns, reserve the right to dig, shaft, drill or bore through said coal for other coal, oil and gas, or other minerals, and for other purposes, said shafting, digging, drilling, or boring not to interfere with the mining of said coal." (Emphasis added.) (Joint Exh. 4).
 {¶ 26} Consolidated acquired the coal estates described in the First, Second, and Third Deeds in 1995.
 {¶ 27} As the trial court noted, the First, Second, and Third Deeds grant to appellees "all" of the No. 8 coal in the specified estates. The First and Second Deeds further grant to appellees "all the rights and privileges needful or useful" to mine the coal while the Third Deed grants appellees the right of way in such a manner that is "proper and necessary" to mine the coal. These rights along with the waiver of damages provisions grant enormous entitlements to appellees. The clear language of these Deeds provides that appellees may do whatever is necessary to mine all of their coal and appellants cannot stop the damage that may result.
 {¶ 28} Maynard St. John, the vice president of both Consolidated and Belmont Coal, testified that longwall mining was the only way to economically mine the coal in other parts of the No. 8 seam. (Tr. 89, 131-32). He further testified that currently all coal in the No. 8 seam is mined by the longwall method. (Tr. 92). St. John stated that if appellees were not permitted to longwall mine because of the landfill on the surface, this would eliminate the entire project and lead to a sterilization of the coal reserve. (Tr. 133-36). He testified that not only is longwall mining the only economic way to remove the coal, but also that it is the safest method for the miners. (Tr. 90). This testimony leads to the conclusion that longwall mining is both needful and useful and proper and necessary in order to mine the coal at issue.
 {¶ 29} Importantly, in the First, Second, and Third Deeds the grantor waives all damages arising from the coal mining. Thus, the grantor acknowledged that damage would occur as a result of the mining and agreed to it.
 {¶ 30} Additionally, appellants' argument that the First, Second, and Third Deeds' language does not support this result since the statutes were enacted 70 years after the Deeds were recorded is meritless. InWells v. American Elec. Power Co. (1988), 48 Ohio App.3d 95, the court faced a similar argument. The appellants in Wells, who sought to restrict the appellees from longwall mining, argued that in 1958 and 1959 when the deeds in question were executed providing the grantees the right to remove the coal "by underground mining processes," the longwall mining method was not within contemplation of the parties. The court held that although longwall mining could not have been within the contemplation of the parties when the deeds were executed, the language of the conveyance conferred the right to remove the coal by the longwall method. Id. at paragraph two of the syllabus. Thus, the court demonstrated that although not contemplated at the time of the original conveyance, the deeds in question still allowed for longwall mining. We are faced with a similar situation in the present case. Although the First, Second, and Third Deeds did not contemplate the statutory restrictions on mining as a barrier, the language of these Deeds makes clear appellees have the right to do whatever is "needful or useful" and "proper and necessary" to mine the coal. Due to changes in technology, mining techniques and regulation over the years, a permit is now needful, useful, proper, and necessary to mine coal.
 {¶ 31} Consequently, appellants' first stated issue of the first assignment of error is without merit.
 {¶ 32} Appellants' second issue states:
 {¶ 33} "The trial court erred in finding that despite the doctrine of failure to exhaust administrative remedies, it could determine whether Consolidated Land Company and Belmont Coal, Inc. would receive a permit to operate a coal mine, even though this is a decision entrusted to an administrative agency."
 {¶ 34} Appellants point out that although Belmont Coal filed an application with the ODNR to longwall mine the property at issue, the application does not address the proposed landfill nor has the ODNR ruled on the application. (Plaintiffs' Exh. 5; Tr. 162). Therefore, appellants argue, the trial court should have denied appellees' complaint for an injunction since appellees have not yet exhausted the administrative process involved. Citing, Jones v. Chagrin Falls (1997), 77 Ohio St.3d 456. Appellants contend that the trial court cannot accurately predict what the ODNR will do with regard to issuing or not issuing a permit to Belmont Coal. They take issue with the court's finding that, "[a]waiting a decision from ODNR regarding Belmont's mining permit application constitutes a vain act. Village of Euclid, Ohio v. Ambler Realty, Co.,272 U.S. 365." (Findings Conclusions, paragraph 34, p. 29). Appellants argue that Euclid is not on point because in order to constitute a "vain act" a party must demonstrate that the agency in question lacks any authority to grant it relief. Citing, Nemazee v. Mt.Sinai Medical Ctr. (1990), 56 Ohio St.3d 109. They assert that in order in to claim a "vain act," appellees would have to show the ODNR would never grant them a permit to mine under the proposed landfill.
 {¶ 35} A party is not entitled to judicial relief for a supposed or threatened injury until it has exhausted the prescribed administrative remedy. Jones, 77 Ohio St.3d at 462. This requirement is not jurisdictional, but may be raised as an affirmative defense. Jones, 77 Ohio St.3d at syllabus. Since the doctrine of failure to exhaust administrative remedies is an affirmative defense, a party may waive it if not timely asserted and maintained. Jones, 77 Ohio St.3d at 462. Thus, the burden was on appellants to both raise this defense and prove it to the trial court.
 {¶ 36} Appellants contend the ODNR could grant appellees a mining permit; therefore, the court allowed appellees to circumvent the administrative process by determining that the ODNR would not grant the permit. Appellants established that the ODNR had not yet denied appellees' permit. Thus, a further examination into the vain act exception is warranted.
 {¶ 37} The trial court found that awaiting a decision from the ODNR regarding Belmont's mining permit application would constitute a "vain act." "[A] `vain act' occurs when an administrative body lacks the authority to grant the relief sought; a vain act does not entail the petitioner's probability of receiving the remedy. The focus is on thepower of the administrative body to afford the requested relief, and not on the happenstance of the relief being granted." Nemazee,56 Ohio St.3d at 115. (Emphasis sic.) However, "[a] lack of authority to grant relief is a subset of the greater concept that the doctrine of exhaustion of remedies will apply only, `* * * if there is a remedy which is effectual to afford the relief sought.'" Grudzinski v. Medical College of Ohio
(Apr. 12, 2000), 6th Dist. No. L-00-1098, quoting Kaufman v. NewburghHeights (1971), 26 Ohio St.2d 217, syllabus. When proceeding with the administrative process would constitute a vain act, a party need not do so. Pappas Assoc. Agency, Inc. v. State Auto. Mut. Ins. Co. (Jan. 7, 1998), 9th Dist. No. 18458. Thus, a vain act is an exception to the doctrine of failure to exhaust administrative remedies.
 {¶ 38} In the present case, the trial court concluded:
 {¶ 39} "* * * [Appellants] have failed to meet their burden of proof to establish that [appellees] have failed to exhaust their administrative remedies. In fact, [appellants] have presented no evidence to support their contention that [appellees] have administrative avenues open that they have not pursued. [Appellants] assume that ODNR and OEPA are appropriate forums to resolve this property rights dispute as the result of federal legislation, which occurred seventy (70) years after the coal severances and mining rights were conveyed. This Court whollydisagrees with that assumption. As previously stated, this proceeding is a justiciable controversy involving a dispute of property rights and this Court is the only forum to address such issues. Awaiting a decision from ODNR regarding Belmont's mining permit application constitutes a vain act." (Findings Conclusions, paragraph 34, p. 28-29). (Emphasis sic.) (Internal citations omitted.)
 {¶ 40} The trial court was correct in finding that waiting for the ODNR to deny the permit would constitute a vain act. First, appellants testified that they were ready to begin construction of the landfill. If appellants began construction immediately, appellees would be too late in attempting to stop them by the time the ODNR determined whether to deny the permit. Second, since appellees sought an adjudication to protect their property rights and since the ODNR cannot adjudicate property rights disputes or issue injunctions to protect those rights, the court system was the appropriate forum to decide this dispute. It was not possible for the ODNR to grant appellees the relief they sought.
 {¶ 41} Accordingly, appellants' second stated issue of the first assignment of error is without merit.
 {¶ 42} Appellants' third issue states:
 {¶ 43} "The trial court erred in finding by clear and convincing evidence that the Ohio Department of Natural Resources would deny Belmont Coal, Inc. a permit to conduct longwall mining under a CDD landfill when the Chief of that Department testified that it was possible to receive a permit under such circumstances."
 {¶ 44} The trial court found that appellees demonstrated if Loy built the CDD landfill, they would suffer irreparable harm. (Findings Conclusions, paragraph 28, p. 26). Construction of the landfill would result in extinguishment of appellees' rights in the coal estates due, in part, to appellees' failure to obtain a mining permit. (Findings Conclusions, paragraph 28, p. 26).
 {¶ 45} Appellants argue that the trial court ignored the testimony of Michael Sponsler (Chief Sponsler), the Chief of the Division of Mineral Resources Management at the ODNR. Specifically, they cite to the following testimony:
 {¶ 46} "Q. If the landfill is not included in their plan, correct, but the landfill is subsequently identified, would they have to — would you deny the permit?
 {¶ 47} "A. Okay. During the — During the permit application review process, then the — the landfill becomes identified. What we would do, our permit application process is a — what I would describe as a problem-solving type of process, and the burden of proof, of course, is on the operator to demonstrate that what they're proposing to do will comply with the law.
 {¶ 48} "We try not to be overly proscriptive in how they obtain that end result of complying with the law or achieving the environmental end result. So during the permit application review process, we would ask them to address how they would deal with various features that are on the surface that — that may become damaged.
 {¶ 49} "If one of those was a landfill, yes, we would ask questions about that, and ask them to demonstrate how they were going to prevent significant environmental harm, how they will do repairs or — and there is — in my experience, there is just a wide variety of proposals that sometimes you never imagine are proposed that can sometimes unexpectedly achieve the — the standards of the regulations.
 {¶ 50} "So we would ask them first to demonstrate how they're going to deal with that feature.
 {¶ 51} "* * *
 {¶ 52} "Q. If the mining operator, in their discussions with the Division, cannot propose alternatives for addressing subsidence damage to this surface structure including a landfill, what does the Division do then?
 {¶ 53} "A. If — you know, if we've gone through — Again, the monkey's on their back to be able to propose a way to comply with the regulations, burden of proof, I guess I should say, is on the operator.
 {¶ 54} "You know, if — If the operator chooses not to or cannot demonstrate that the regulations can be met with respect to repairing, there is a variety of alternatives. There could be an allowance for a different type of mining that would prevent subsidence; there could be a provision to exclude certain areas from — there can be an exclusion from allowing mining, longwall subsidence mining, from certain areas of the permit application area. Those are a couple of the alternatives that I can think of.
 {¶ 55} "Q. You mentioned earlier, Mr. Sponsler, that this concern regarding the construction of the CDD landfill above Belmont Coal's proposed mining activities was also brought to your attention by representatives of Belmont Coal; is that correct?
 {¶ 56} "A. Yes.
 {¶ 57} "Q. And based upon those discussions, what did you — Can you recall what you told those representatives?
 {¶ 58} "A. I believe it was pretty consistent with what I just indicated, that, you know, they would be charged with — not charged with, but they would be required to come up with a — a suitable plan for repair or compensation, or not — Well, in this event, it would just be repair, and, you know, I would look at — We would need to look at the issues of this significant environmental harm.
 {¶ 59} "And some of the alternatives to denial are different mining extraction methods, maybe even a different way of doing the subsidence, perhaps even getting together with surface landowners and putting in some methods of prevention. In the case of a landfill, a flexible liner maybe as a possibility to deal with the issues." (Sponsler depo. 35-38).[3]
 {¶ 60} Appellants contend that if the court had considered this testimony, it would not have found that the ODNR would not issue appellees a permit.
 {¶ 61} Mining applicants must apply for a permit and demonstrate to the ODNR they can either find alternatives for all substantial risks of subsidence damage or provide the ODNR with assurance that they can repair and remediate significant environmental harm when the damage occurs. (Findings Conclusions, paragraph 76, p. 12). The court concluded Belmont Coal cannot prove to the ODNR that its mining will not cause subsidence damage to the landfill's soil liner because such damage is inevitable. (Findings Conclusions, paragraph 87, p. 14-15). It also concluded Belmont Coal cannot assure the ODNR that it can prevent the escape of leachate into the groundwater or that it can remediate environmental harm. (Findings Conclusions, paragraph 87, p. 14-15).
 {¶ 62} A party seeking a permanent injunction must demonstrate two elements: (1) the injunction is necessary to prevent irreparable harm; and (2) the party does not have an adequate remedy at law. PG v.Stoneham (2000), 140 Ohio App.3d 260, 267. The party must prove these elements by clear and convincing evidence. Id. at 267-68. "Clear and convincing evidence is that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 63} Whether or not to grant an injunction is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. FOP v. City of Cleveland (2001), 141 Ohio App.3d 63,81. Abuse of discretion connotes more than an error in judgment; it implies that the trial court's attitude was arbitrary, unreasonable or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 64} Appellants' assertion that the trial court did not consider Chief Sponsler's deposition is without merit. The trial court stated on the record that it read Chief Sponsler's deposition in careful detail. (Tr. 457). The trial court also cited Chief Sponsler's testimony numerous times for support in its Findings Conclusions. See, Findings 
Conclusions, paragraph 27, p. 6; paragraphs 37-39, p. 8; paragraphs 72-76, p. 12; paragraph 80, p. 13; paragraphs 82-84, p. 13-14; paragraph 87, p. 14-15; paragraphs 90-91, p. 16; paragraph 97, p. 18; paragraph 99, p. 18.[4] Additionally, although Chief Sponsler never said the ODNR would deny Belmont Coal's permit, he never said it would grant Belmont Coal's permit.
 {¶ 65} Furthermore, several witnesses testified that based on the information presented, they opined the ODNR would deny Belmont Coal's permit. St. John, Consolidated's vice president and a coal mine manager, testified his opinion that the ODNR would deny the permit was based, in part, on: (1) his review of Chief Sponsler's deposition transcript; and (2) a meeting he had with Chief Sponsler where Chief Sponsler told him that if he damaged the landfill/groundwater he would have to repair it and if he could not repair it, he could not longwall mine. (Tr. 149-50). He further testified that mining beneath the landfill would in fact crack the soil liner and release the leachate into the groundwater. (Tr. 144-46). Additionally, St. John testified that appellees would not be able to repair the damage to the soil liner. (Tr. 148). Jack Hamilton, the president of an engineering and consulting firm which prepared the mining permit application for Belmont Coal, testified that the ODNR would not issue Belmont Coal a permit to mine beneath the proposed landfill if Belmont Coal could not come up with a mitigation plan for the damage it would cause. (Tr. 227-29). William Bosworth, a recent retiree who worked as a manager of mine and environmental services and was experienced with longwall mining, testified the ODNR would not issue Belmont Coal a permit. (Tr. 305-306). Bosworth based his opinion on the irreparable damage longwall mining would cause to the proposed landfill's leachate system and the release of leachate into the groundwater and on his experience with longwall mining and mine permitting. (Tr. 305).
 {¶ 66} Appellants did present two witnesses who testified the subsidence caused by longwall mining would not compromise the soil liner. Dr. Craig Benson, a civil engineer, testified that the anticipated subsidence would not effect the integrity of the soil liner. (Tr. 601-602). Victor Wicks, a registered professional engineer, testified that subsidence in the landfill area would not hurt the liner itself. (Tr. 642-43).
 {¶ 67} Based on the above testimony, the trial court did not abuse its discretion in granting the injunction. Conflicts in testimony are best left up to the trier of fact. Beekman v. Beekman (1994),96 Ohio App.3d 783, 787. Appellees provided clear and convincing evidence that if the court did not grant the injunction, their coal estates would be sterilized and they had no adequate remedy at law.
 {¶ 68} Accordingly, appellants' third stated issue of the first assignment of error is without merit.
 {¶ 69} Appellants' fourth issue states:
 {¶ 70} "The trial court erred in extending the permanent injunction over the entire 270.7678 acres of surface estate sought to be conveyed from Capstone Holding Company to Loy Reclamation Project LLC. At most, the injunction should cover only the surface that lies above the three mineral severances put into issue by the coal owners."
 {¶ 71} Appellants argue that the mineral severances that appellees sued upon lie under only a portion of the surface property that Loy is attempting to purchase from Capstone. They assert that if the trial court acted properly in issuing an injunction, it should only have issued an injunction for the surface property above the three mineral severances, not for the entire 270.7678 acres Loy is attempting to acquire. Appellants contend that the injunction covers a portion of the McKelvey Deed property and portions of two other mineral severances that were not at issue in this case. Appellants argue the McKelvey Deed does not include any of the language the trial court used to support its decision, as did the First, Second, and Third Deeds. Thus, they claim the injunction should be modified to apply only to that surface which lies above the three mineral severances at issue.
 {¶ 72} As stated above, whether or not to grant an injunction is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. FOP, 141 Ohio App.3d at 81.
 {¶ 73} The First, Second, and Third Deeds give appellees the right to mine all of the No. 8 coal seam as provided in the Deeds. The McKelvey Deed also gives appellees comparable rights to mine the coal thereunder. If appellants were to construct a CDD landfill on even a portion of the 270.7678 acres, appellees would not be able to mine all of their coal. St. John's testimony supports this conclusion. St. John testified that the 270 acres covers five of his proposed mining panels. (Tr. 165). He stated that Loy's proposed license covered the entire 270 acres. (Tr. 165). Most importantly, St. John testified that the 270 acres is at the heart of the proposed mining panels and that to be precluded from mining in this area would eliminate all mining nearby. (Tr. 136, 165-66). Therefore, if appellants were permitted to construct a CDD landfill on even part of the 270 plus acres, appellees would be precluded from mining all of the coal to which they are entitled. Hence, the trial court did not abuse its discretion in issuing the injunction over the entire 270.7678 acres.
 {¶ 74} Accordingly, appellants' fourth stated issue of the first assignment of error is without merit.
 {¶ 75} Since all four of appellants' stated issues lack merit, the first assignment of error is without merit.
 {¶ 76} Appellants' second assignment of error states:
 {¶ 77} "THE TRIAL COURT ERRED IN FINDING THAT CONSOLIDATED LAND COMPANY AND BELMONT COAL, INC. MAY CONDUCT LONGWALL MINING, WHICH WILL CAUSE SUBSIDENCE OF THE SURFACE, UNDER THE SURFACE ESTATE THAT LIES ABOVE THE McKELVEY MINERAL SEVERANCE BECAUSE THAT SEVERANCE DOES NOT GIVE THE OWNER OF THE COAL ESTATE THE RIGHT TO SUBSIDE THE SURFACE."
 {¶ 78} In its counterclaim, Capstone sought a declaration that appellees were not entitled to engage in longwall mining below the surface of the McKelvey Deed property because the McKelvey Deed does not contain a waiver of the surface owner's absolute right to lateral and subjacent support, as do the First, Second, and Third Deeds. The trial court held that Capstone is entitled to rights of subjacent or lateral support to the surface of the McKelvey Deed land. Therefore, appellees are liable for damages, if any, to the surface of the land caused by their failure to leave the required support, irrespective of actual negligence.
 {¶ 79} Appellants assert that subsidence of the surface land is an inevitable result of longwall mining underneath it. Thus, appellants argue the trial court should have declared that appellees were not permitted to use the longwall mining method. They cite to Burgner v.Humphrey (1884), 41 Ohio St. 340, for support. In Burgner, the court stated that when a grantor grants the mineral rights to a grantee and reserves the surface rights, the grantee is entitled only to so much of the minerals that he can extract without injury to the superincumbent soil unless the deed states otherwise. Id. at 352. Appellants argue that monetary compensation is not sufficient for the damage that will be caused to the land by longwall mining. Thus, appellants request that the trial court's decision be modified to declare that appellees may not lawfully engage in longwall mining under the McKelvey Deed land or within a sufficient buffer area around that property.
 {¶ 80} While Capstone termed its motion as one for declaratory judgment, it actually sought a permanent injunction to prevent appellees from longwall mining under the McKelvey Deed property. Once again, the trial court has the discretion to determine whether or not to grant an injunction. FOP, 141 Ohio App.3d at 81.
 {¶ 81} The McKelvey Deed states in pertinent part:
 {¶ 82} "It is agreed by both parties hereto that access to the above described premises shall be obtained exclusively under ground from adjoining land and that if any surface of the aforesaid premises be used for buildings or machinery or both or other equipments necessary to effect the purposes of this agreement party of the second part shall pay to party of the first part a reasonable sum for said surface. Said parties of the first part reserves the right to drill for oil or gas or operate in any other way for minerals.
 {¶ 83} "Party of the second part are to have the free and uninterrupted right of way under said land at such points and in such manner as may be proper and necessary for the purpose of digging, mining, draining, and ventilating and carrying away said coal together with the privilege of mining and removing under said described premises other coal belonging to said party of the second part their heirs and assigns or which may hereafter be acquired."
 {¶ 84} As the trial court found, there is no damage waiver in the McKelvey Deed as there was in the First, Second, and Third Deeds. Absent an express waiver of damages, the surface owner has rights of subjacent or lateral support. Wells, 48 Ohio App.3d at 98; Ohio Collieries Co. v.Cocke (1923), 107 Ohio St. 238. Thus, appellants are entitled to subjacent support from appellees under the McKelvey Deed property. The issue is whether the court can order that the coal estate owner pay compensation for damage to the surface owner instead of enjoining the coal estate owner from subsiding the surface.
 {¶ 85} Although appellants allege that monetary relief is not adequate, they did not present any evidence of the damage they will suffer if appellees are permitted to longwall mine under the McKelvey property. They make no specific reference to why they cannot be compensated monetarily for any damage appellees may cause to the surface or what irreparable harm they will suffer. Additionally, the court made certain to state that appellees will be liable for damage to the surface irrespective of whether appellees are negligent in conducting their mining operations. Thus, the court ensured appellees would compensate appellants for any surface damage that may result in the normal course of mining. Hence, the trial court did not abuse its discretion in denying Capstone's request for a permanent injunction against longwall mining over the McKelvey property.
 {¶ 86} Accordingly, appellants' second assignment of error is without merit.
 {¶ 87} The decision of the trial court is hereby affirmed.
Vukovich, J., and DeGenaro, J., concur.
[1] The longwall method involves taking a whole section of coal from the area. Buckeye Forest Council v. Div. of Mineral Res. Mgmnt., 7th Dist. No. 01-BA-18, 2002-Ohio-3010. After the coal is extracted, nothing remains to hold up that section and the surface area of that land subsides filling in the empty section left from the coal extraction. Id.
[2] "Leachate" is water that becomes contaminated as it comes in contact with waste from the landfill, including organic and inorganic material such as hydrocarbons, gasoline, trichloroethylene, triphenylethelene, paint thinner, calcium, magnesium, sodium, potassium, chloride, sulfates and heavy metals. (Findings Conclusions, paragraphs 55-56, p. 10).
[3] Chief Sponsler was unable to testify at trial so the court accepted his deposition into evidence as if he had testified. Thus, references to Chief Sponsler's testimony are to his deposition transcript.
[4] Chief Sponsler's deposition was admitted as Plaintiff's Exhibit 48.